*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 83**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

SHAWN H. RAY, GABRIEL M. STEWART, LORI POULSEN,
DEREK HOLT, and ERIC HUNTER,
*Appellants,*

*v.*

WAL-MART STORES, INC.,
*Appellee.*

No. 20130940
Filed September 17, 2015

On Certification from the United States District Court
for the District of Utah
No. 1:11-cv-104

Attorneys:

Lorraine P. Brown, Dennis A. Gladwell, Ogden, for appellants

Kathleen W. Toth, James E. Ji, Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
JUSTICE DURHAM, JUSTICE PARRISH, and JUDGE VOROS joined.

ASSOCIATE CHIEF JUSTICE LEE filed a dissenting opinion.

Due to his retirement, JUSTICE NEHRING, did not participate herein;
COURT OF APPEALS JUDGE J. FREDERIC VOROS sat.

JUSTICE DENO G. HIMONAS became a member of the Court on
February 13, 2015, after oral argument in this matter, and
accordingly did not participate.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1 Under the at-will employment doctrine, an employer has broad discretion to manage its workforce and may, accordingly, fire an employee for any reason not prohibited by law. But there are several exceptions to at-will employment, including when an

employee's termination violates a clear and substantial public policy of the State of Utah. In this case, several employees[1] of Wal-Mart Stores, Inc. (Wal-Mart) were involved in physical confrontations with shoplifting customers and were ultimately fired for violating company policy. Wal-Mart's policy requires employees to disengage and withdraw from potentially violent situations. The Employees sued Wal-Mart in federal district court for wrongful termination, arguing that terminating a person's employment for exercising self-defense in the workplace violates Utah public policy. The district court concluded that their argument raised an issue of first impression under Utah law—whether the right of self-defense is the type of public policy that provides an exception to the at-will employment doctrine. Accordingly, it certified the following question of law to us: "Is the right of self-defense a substantial public policy exception to the at-will employment doctrine that provides the basis for a wrongful discharge action?"

¶2    We conclude that the policy favoring the right of self-defense is a public policy of sufficient clarity and weight to qualify as an exception to the at-will employment doctrine. But we limit the exception to situations where an employee reasonably believes that force is necessary to defend against an imminent threat of serious bodily harm and the employee has no opportunity to withdraw.

## Background

¶3    This case arises out of two separate incidents involving Wal-Mart employees and shoplifters.[2] Each of the Employees was tasked with, among other things, investigating, documenting, and preventing the theft of merchandise by customers and employees from Wal-Mart stores. The Employees were fired for violating Wal-Mart's Policy AP-09, which provides,

> If the Suspect is believed to possess a weapon, the Suspect must not be approached. If during an approach or investigation, it becomes apparent that the Suspect has a weapon or brandishes or threatens use of a

---

[1] We refer to the employees collectively as the "Employees," but we also refer to them individually as needed.

[2] We note that the district court was presented with a third incident but dismissed the plaintiff's claim arising out of that incident because the plaintiff did "not come forward with facts that would allow a reasonable jury to grant him relief." Accordingly, we do not recite this incident in our recounting of the facts.

weapon, all associates must disengage from the situation, withdraw to a safe position, and contact law enforcement.

If at any point the Suspect or any other [sic] involved becomes violent, disengage from the confrontation, withdraw to a safe position and contact law enforcement.

¶4   The first incident involved plaintiffs Derek Holt and Eric Hunter, who were employed at Wal-Mart's West Valley City, Utah store. Mr. Holt and Mr. Hunter confronted a shoplifter. When the shoplifter tried to run away, they grabbed her arms. During the ensuing struggle, the shoplifter pulled out a small pocketknife and shouted that she was going to stab Mr. Holt and Mr. Hunter if they did not let go. Mr. Holt and Mr. Hunter maintained their hold, however, and a customer helped pry the knife out of the shoplifter's hand. Wal-Mart terminated Mr. Holt's and Mr. Hunter's employment for violating Policy AP-09.

¶5   The second incident involved plaintiffs Shawn Ray, Lori Poulsen, and Gabriel Stewart, who were employed at Wal-Mart's Layton, Utah store. Several employees at that store, including Mr. Ray and Ms. Poulsen, approached a customer who was attempting to steal a laptop by concealing it in his pants and escorted him to the store's asset protection office, where they were joined by Mr. Stewart. There is some discrepancy regarding what happened next. According to Wal-Mart, the customer placed the laptop on a desk and stated, "You have your laptop, I am now going to leave, and I have something I am not supposed to have." Ms. Poulsen saw the customer move a gun from his back to his coat pocket. A physical struggle ensued, resulting in the Wal-Mart employees pinning the customer against a wall and grabbing the gun.

¶6   The Employees' account of the incident differs somewhat. According to them, after the customer removed the laptop from his pants he said, "I have something I shouldn't have. Don't make me do this!" Ms. Poulsen noticed the customer had a gun and yelled "Gun! Hand!" The customer rushed towards the door but then turned and shoved Mr. Stewart against the wall and pressed the gun to his back. A skirmish resulted, and the Wal-Mart employees managed to remove the gun from the customer's hands and force him to the ground. Ultimately, Mr. Ray, Ms. Poulsen, and Mr. Stewart were all fired following the incident for violating Policy AP-09.

¶7   The Employees filed suit against Wal-Mart claiming that their terminations were in violation of Utah public policy. Wal-Mart

filed a motion for summary judgment, which the federal district court granted in part by dismissing all of the Employees' causes of action other than their claim for wrongful termination in violation of public policy. With respect to that claim, the court certified to us the question of whether self-defense is a substantial public policy exception to the at-will employment doctrine, thus providing a basis for a wrongful termination action. For purposes of certifying the self-defense question, the federal district court asked us to assume that the Employees were unable to safely disengage from the incidents.[3]

## Standard of Review

¶8   "When a federal court certifies a question of law to this court, we are not presented with a decision to affirm or reverse . . . [and thus] traditional standards of review do not apply."[4] Rather, "we answer the legal questions presented without resolving the underlying dispute."[5]

## Analysis

¶9   The question presented in this case is whether in Utah the right of self-defense embodies the type of clear and substantial public policy that qualifies as an exception to the at-will employment doctrine, and thus provides the basis for a wrongful discharge claim. The Employees contend that Utah law reflects a clear and substantial public policy favoring the right of self-defense, as evidenced by various legislative and constitutional provisions that protect the right. And they argue that the public policy interests in favor of self-defense outweigh an employer's competing interests where an employee faces an imminent threat of death or serious bodily harm and has no opportunity to withdraw.

---

[3] Specifically, as to the first incident, the court assumed that "Mr. Holt and Mr. Hunter were acting according to Wal-Mart's procedures when they initially grabbed [the shoplifting customer] and that they were unable to let go of her after they became aware that she had a knife without a legitimate and reasonable fear that they would be stabbed." And as for the second incident, the court assumed that "Mr. Ray, Ms. Poulsen, and Mr. Stewart were unable to safely disengage from [the customer] after he pulled out his gun in the closed office."

[4] *Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 2, 148 P.3d 945 (internal quotation marks omitted).

[5] *Garza v. Burnett*, 2013 UT 66, ¶ 9, 321 P.3d 1104 (internal quotation marks omitted).

¶10 In contrast, Wal-Mart argues that although Utah law evinces a policy favoring the right of self-defense, there is no evidence that the policy extends to the workplace. It further argues that even if there is such a public policy, it is not of sufficient public importance to qualify as an exception to at-will employment, because self-defense provides a purely private benefit to the person exercising the right. And finally, Wal-Mart argues that any public policy interest favoring self-defense is outweighed by an employer's countervailing interests in maintaining "de-escalation, non-confrontation[,] and workplace violence policies" and discouraging employee vigilantism.

¶11 Although we acknowledge that Wal-Mart's interest in regulating its workforce is important, we conclude that there is a clear and substantial public policy in Utah favoring the right of self-defense for three reasons. First, the right of self-defense is enshrined in Utah statutes, the Utah Constitution, and our common law decisions. Second, a policy favoring the right protects human life and deters crime, conferring substantial benefits on the public. And third, the public policy supporting the right of self-defense outweighs an employer's countervailing interests in circumstances where an employee reasonably believes that force is necessary to defend against an imminent threat of serious bodily injury and the employee has no opportunity to withdraw. Accordingly, we answer the certified question in the affirmative and hold that Utah law reflects a policy favoring the right of self-defense, and that policy is of sufficient magnitude to qualify as a substantial public policy exception to the at-will employment doctrine, but only under the narrow circumstances where an employee cannot withdraw and faces imminent serious bodily injury.

## I. Legal Background

¶12 We begin by outlining the relevant legal principles. Under Utah law, there is a presumption that all employment relationships entered into for an indefinite period of time are at-will.[6] At-will employment relationships may be terminated by either an employer or an employee for any reason other than those prohibited by law.[7]

---

[6] *Hansen v. Am. Online, Inc.*, 2004 UT 62, ¶ 7, 96 P.3d 950.

[7] *Id.* There are other exceptions to at-will employment that are not at issue in this case—when "there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of [some] agreed-upon condition" or "a statute or regulation restricts the right of an employer to terminate an

(Continued)

An employer's decision to terminate employment is presumed valid unless an employee can show, among other things, that "the termination of employment constitutes a violation of a clear and substantial public policy."[8] An at-will employee whose employment has been terminated in violation of a clear and substantial public policy may sue for wrongful termination.[9] In essence, when this exception applies, we determine that "the public interest is so strong and the policy so clear and weighty that we should place the policy beyond the reach" of an at-will employment contract.[10]

¶13 In this context, the definition of public policy is "much narrower than traditional notions of public policy," so as to not unduly infringe on an employer's discretion in discharging employees.[11] We have identified four categories of public policies that may provide a basis for a wrongful termination claim:

> (i) refusing to commit an illegal or wrongful act, such as refusing to violate the antitrust laws; (ii) performing a public obligation, such as accepting jury duty; (iii) *exercising a legal right or privilege, such as filing a workers' compensation claim*; or (iv) reporting to a public authority criminal activity of the employer.[12]

Only the third category—exercise of a legal right or privilege—is at issue in this case. We have noted that this category "poses analytical challenges different from, and generally greater than, the others" because "[t]he analysis of whether the public policy exception

---

employee under certain conditions." *Id.* (internal quotation marks omitted).

[8] *Id.* (internal quotation marks omitted).

[9] *See Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1042 (Utah 1989) ("Where an employee is discharged for a reason or in a manner that contravenes sound principles of established and substantial public policy, the employee may typically bring a tort cause of action against his employer.").

[10] *Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 13, 148 P.3d 945 (internal quotation marks omitted).

[11] *Rackley v. Fairview Care Ctrs., Inc.*, 2001 UY 32, ¶ 15, 23 P.3d 1022.

[12] *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 408 (Utah 1998) (emphasis added) (citations omitted).

applies to a particular legal right or privilege will frequently require a balancing of competing legitimate interests."[13]

¶14 But having a legal right or privilege alone does not mean that a terminated employee will necessarily have a valid claim for wrongful termination. To determine whether the legal right at issue reflects the type of clear and substantial Utah public policy that qualifies as an exception to the at-will rule, we consider three factors: (1) whether the policy at issue is reflected in authoritative sources of state public policy,[14] (2) whether the policy affects the public generally as opposed to the private interests of the employee and the employer,[15] and (3) whether countervailing policies outweigh the policy at issue.[16] These factors are conjunctive requirements; to have a wrongful termination claim, an employee must demonstrate that each factor supports recognizing an exception to at-will employment.

¶15 A policy is recognized in an authoritative source of state public policy if it is "plainly defined by legislative enactments, constitutional standards, or judicial decisions."[17] With respect to the second factor, a policy qualifies as an exception to the at-will rule only if it is "of overarching importance to the public, as opposed to the parties only."[18] And even if the first two factors both favor recognizing a policy as an exception to at-will employment, strong countervailing policy interests—including the employer's interest in regulating its workforce—may outweigh them.[19] It is therefore

---

[13] *Hansen*, 2004 UT 62, ¶¶ 10–11.

[14] *Touchard*, 2006 UT 71, ¶ 12.

[15] *Id.* ¶¶ 13–14, 18.

[16] *Hansen*, 2004 UT 62, ¶¶ 10–11.

[17] *Ryan*, 972 P.2d at 405.

[18] *Retherford v. AT & T Commc'ns of the Mountain States, Inc.*, 844 P.2d 949, 966 n.9 (Utah 1992).

[19] *Touchard*, 2006 UT 71, ¶ 10; *see also Hansen*, 2004 UT 62, ¶ 11 (noting that courts balance "the interests of the employer to regulate the workplace environment to promote productivity, security, and similar lawful business objectives, and the interests of the employees to maximize access to their statutory and constitutional rights within the workplace" to determine whether the exercise of a legal right or privilege supports a wrongful discharge claim under the public policy exception).

somewhat rare that a "policy is so clear and weighty that" we conclude it should be placed "beyond the reach of contract."[20]

¶16 Having summarized the applicable legal framework, we now engage in an analysis under the three factors described above and conclude that the right of self-defense reflects the rare type of clear and substantial policy that qualifies as an exception to at-will employment.

## II. The Policy Favoring the Right of Self-Defense Is of Sufficient Magnitude to Qualify as an Exception to At-Will Employment

¶17 We conclude that Utah law reflects a policy favoring the right of self-defense with a duty to retreat in some circumstances, and that policy is of sufficient magnitude to qualify as an exception to at-will employment. First, the right of self-defense is plainly defined by authoritative sources because it is enshrined in the Utah Constitution, the Utah Code, and our common law decisions. But those sources do not articulate an absolute right to meet force with force; rather, in some circumstances, a person cannot engage in self-defense without first making a reasonable effort to withdraw. Second, promoting self-defense benefits the public as a whole by preserving and protecting human life and preventing the completion of crime.

¶18 And third, the policy favoring the right of self-defense outweighs an employer's countervailing interest in regulating the workplace. The right is of paramount importance because it allows a person to protect against imminent bodily harm or death. And although a policy favoring the right of self-defense does restrict an employer's ability to control the workplace and regulate its property to some degree, we hold that such a policy does not preclude an employer from maintaining non-confrontation and de-escalation policies in situations where an employee has an opportunity to safely withdraw or does not face imminent danger.

### A. The Right of Self-Defense is Reflected in Authoritative Sources of Utah Public Policy

¶19 We will not recognize a public policy as an exception to the at-will rule unless it is reflected in authoritative sources of state public policy. Accordingly, in prior cases we have examined whether a policy is "plainly defined by legislative enactments, constitutional standards, or judicial decisions."[21] As we explain in more detail

---

[20] *Retherford*, 844 P.2d at 966 n.9.

[21] *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 405 (Utah 1998).

below, this does not mean that the scope of a particular public policy must be coextensive with the statement of positive law upon which it is based.[22] Rather, we look to each authoritative source that bears on the question before us to see if state law reflects an underlying public policy "so substantial and fundamental that there can be virtually no question as to [its] importance to the public good."[23]

¶20 That standard is met here. The right of self-defense is enshrined in the Utah Constitution, Utah's self-defense statute, and our common law decisions. But as we explain below, Utah law does not set forth an absolute right to meet force with force. Rather, the relevant authorities recognize instances where individuals have a duty to retreat before engaging in self-defense. We first discuss state constitutional provisions and then examine the self-defense statute and Utah common law decisions.

1. The Utah Constitution evinces a public policy favoring the right of self-defense

¶21 "Our most fundamental and least ephemeral expression of public policy are found in the Utah Constitution."[24] The Employees argue that two constitutional provisions support their position that there is a "clear and substantial" public policy in favor of self-defense. These provisions include article I, sections 1 and 6 of the Utah Constitution. We agree with the Employees and conclude that both provisions evince a clear and substantial public policy favoring the right of self-defense.

¶22 First, the language in article I, section 1 unequivocally recognizes that "[a]ll men . . . the inherent and inalienable right to enjoy and defend their lives and liberties." The section's drafters did not place any temporal or geographic restrictions on the scope of that right, and there is simply no way to read the text as establishing a right of self-defense at an individual's home or in public, but not at his or her place of business. Nevertheless, Wal-Mart argues that this provision cannot provide a basis for recognizing a "clear and substantial" public policy in favor of self-defense, because the Utah Constitution only protects rights from infringement by state actors. The dissent shares Wal-Mart's concern, arguing that constitutional provisions are "a problematic source of public policy" because they

---

[22] *See infra* ¶¶ 53–58.

[23] *Rackley v. Fairview Care Ctrs., Inc.*, 2001 UT 32, ¶ 18, 23 P.3d 1022 (internal quotation marks omitted).

[24] *Hansen v. Am. Online, Inc.*, 2004 UT 62, ¶ 12, 96 P.3d 950.

"preserve[] fundamental rights of citizenship from incursion *by the government,*" not provide "rights in the workplace" that insulate employees from an employer's personnel decisions.[25]

¶23 This argument misapprehends the nature of the at-will doctrine. At-will employment and exceptions to it are common law rules.[26] And such rules, by their very nature, do "not rest for their authority upon any express or positive statute or other written declaration."[27] To be sure, our caselaw tethers the scope of public policy exceptions to those policies "plainly defined" by statements of positive law. But we have also recognized that this inquiry involves "loo[king] beyond the provision in question to determine whether the motivating policy behind it constitutes a clear and substantial public policy."[28] For that reason, it is "entirely within our province" to recognize public policy exceptions based on constitutional provisions and other authoritative sources that do not directly regulate employment.[29] And as we discuss in more detail below, neither must a recognized exception be coextensive with the source of positive law upon which it is based.[30]

---

[25] *Infra* ¶¶ 93–94 (emphasis added) (internal quotation marks omitted).

[26] *See, e.g., Touchard v. La-Z-Boy Inc.,* 2006 UT 71, ¶ 21, 148 P.3d 945 (noting that "wrongful discharge is a common law claim" and concluding that the "lack of an anti-retaliation provision" in the Workers' Compensation Act "does not affect this court's ability to recognize this state's public policy for purposes of a wrongful discharge cause of action"); *Price v. W. Loan & Sav. Co.,* 100 P. 677, 680 (Utah 1909) (holding as a matter of contract law that where an employment agreement did not specify a term of employment, the agreement "was terminable at will by either party").

[27] *Egbert v. Nissan Motor Co.,* 2010 UT 8, ¶ 16, 228 P.3d 737 (internal quotation marks omitted).

[28] *Rackley,* 2001 UT 32, ¶ 23.

[29] *See Touchard,* 2006 UT 71, ¶ 21.

[30] *See infra* ¶¶ 53–58. This does not mean public policy exceptions can be conjured up out of whole cloth, however. We have previously cautioned that there must be much more than a "mere hint [of] such an underlying policy" in the statute, constitutional provision, or judicial decision at issue. *Rackley,* 2001 UT 32, ¶ 23. And both the nature and content of such sources must show that the policy itself is "so substantial and fundamental that there can be virtually no

(Continued)

¶24 For these reasons, the Employees' reliance on the Utah Constitution is entirely appropriate. Indeed, we have affirmed the relevance of constitutional provisions to this issue in almost every decision since the public policy exception was first recognized.[31] The Employees do not claim that Wal-Mart violated article I, section 1. Rather, the Employees cite this provision merely to show that the Utah Constitution supports the notion that Utah law reflects a state public policy in favor of self-defense. For this reason, and based on

---

question as to [its] importance for promotion to the public good." *Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1043 (Utah 1989).

[31] *Touchard*, 2006 UT 71, ¶ 12 ("A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions." (internal quotation marks omitted)); *Hansen*, 2004 UT 62, ¶ 12 (stating that the "most fundamental and least ephemeral expressions of public policy are found in the Utah Constitution"); *Rackley*, 2001 UT 32, ¶ 16 ("We have stated that a public policy is 'clear' if it is plainly defined by one of three sources: (1) legislative enactments; (2) constitutional standards; or (3) judicial decisions."); *Burton v. Exam Ctr. Indus. & Gen. Med. Clinic, Inc.*, 2000 UT 18, ¶ 6, 994 P.2d 1261 ("Declarations of public policy can be found in constitutions and statutes."); *Dixon v. Pro Image Inc.*, 1999 UT 89, ¶ 31, 987 P.2d 48 ("A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions." (internal quotation marks omitted)); *Ryan*, 972 P.2d 395, 405 (Utah 1998) ("A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions."); *Retherford v. AT & T Commc'ns of Mountain States, Inc.*, 844 P.2d 949, 960 (Utah 1992) ("[O]nly those public policies that are 'clear' and 'substantial' and arise from statutes or constitutions qualify for vindication through the tort of discharge in violation of public policy."); *Peterson v. Browning*, 832 P.2d 1280, 1282 (Utah 1992) ("[D]eclarations of public policy can be found in our statutes and constitutions."); *Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 165–66 (Utah 1991) ("[T]he public policy that may be the basis for a wrongful discharge action should be defined in the first instance by legislative enactments and constitutional standards which protect the public or promote the public interest." (internal quotation marks omitted)); *Berube*, 771 P.2d 1033, 1043 (Utah 1989) (recognizing that "public policy" can be "deduc[ed] in the given circumstances from constitutional or statutory provisions" (internal quotation marks omitted)).

the unqualified right recognized in section 1's text,[32] we reject Wal-Mart's argument and conclude that this provision evidences a public policy favoring the right of self-defense.[33]

¶25 Second, article I, section 6 also supports recognition of a clear and substantial public policy favoring the right of self-defense. That section provides,

> The individual right of the people to keep and bear arms for security and defense of self, family, others, property, or the state, as well as for other lawful purposes shall not be infringed; but nothing herein shall prevent the Legislature from defining the lawful use of arms.[34]

Like article I, section 1, this provision recognizes an "individual right" for "defense of self, family, others, property, or the state," and it provides that this right "shall not be infringed."[35] And the text places no restrictions or qualifications on when or where that right may be exercised.

¶26 Section 6 also recognizes another right, one for which the text does allow the legislature to impose restrictions—the right "to keep and bear arms" for self-defense or any other lawful purpose.

---

[32] The dissent characterizes the right recognized in article I, section 1 as "vague" and "aspirational" in "nature," and concludes that without more specificity, we have "no idea what that right entails." *Infra* ¶ 97. We see no ambiguity in the text—it unambiguously recognizes Utah citizens' "inalienable right" to "defend their lives." And as we explain below, Utah has recognized a right of self-defense with a duty to retreat since statehood. *See infra* ¶¶ 29–34. This is strong evidence that the original meaning of article I, section 1 encompasses a right with those basic contours. *See Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 51, 140 P.3d 1235 (considering "[b]oth the common law and statutory law in force at the time of the formation of [the Utah] constitution" to determine what kinds of speech are protected by article I, section 7 of the state constitution).

[33] Wal-Mart makes this argument with respect to each constitutional and statutory provision discussed below, and in each case we reject it for the same reasons we do so here.

[34] UTAH CONST. art. I, § 6.

[35] *Id.*

This section allows the legislature to "defin[e]" what constitutes "the lawful use of arms,"[36] and our legislature has enacted a number of restrictions on the use of firearms under this provision.[37] But there is no language in section 6 that extends the legislature's authority to impose restrictions on the broader right of self-defense.

¶27 Wal-Mart focuses on the legislative restrictions allowed in section 6 and argues that we have already determined that the rights recognized in that provision are not clear and substantial public policies. In support, Wal-Mart cites *Hansen v. American Online, Inc.*[38] But in that case, we were asked to determine "whether the right to *keep and bear arms* in Utah is a public policy which is so clear and substantial as to supersede an employer's attempt to restrict weapons in the workplace by contract."[39] We held that the right did not outweigh an employer's interests, primarily because "the legislature ha[d] purposefully declined to give *the right to keep and bear arms* absolute preeminence over the right to regulate one's own private property."[40] Our opinion was completely silent regarding the broader right of self-defense.

¶28 Accordingly, we reject Wal-Mart's contention that *Hansen* forecloses recognition of a policy in favor of self-defense. And we conclude that article I, sections 1 and 6 of the Utah Constitution are strong evidence that Utah has a clear and substantial public policy of allowing individuals to protect themselves and others from imminent harm.

2. Utah's "Stand Your Ground" statute and common law decisions also reflect a public policy favoring the right of self-defense

¶29 Provisions of the Utah Code similarly support recognition of a public policy supporting the right of self-defense. Utah has been a "Stand Your Ground" state since 1994.[41] Utah Code section 76-2-401 provides "a defense to prosecution for any offense" if the defendant acted to protect himself or others from imminent harm, as described

---

[36] *Id.*

[37] *See, e.g., Hansen*, 2004 UT 62, ¶¶ 15, 23 (discussing Utah statutes that restrict the possession and use of firearms).

[38] 2004 UT 62.

[39] *Id.* ¶ 20 (emphasis added).

[40] *Id.* (emphasis added).

[41] *See* 1994 Utah Laws 281.

in section 402.[42] In framing the scope of that right, section 402 allows a person to "threaten[] or us[e] force against another when and to the extent that the person reasonably believes that force or a threat of force is necessary to defend the person or a third person against . . . imminent . . . unlawful force."[43] The statute further provides that there is generally no "duty to retreat from the force or threatened force" if the person is located in a place where he or she "has lawfully entered or remained."[44] But there are exceptions—a person may not engage in self-defense if he or she "was the aggressor or was engaged in combat by agreement" and made no attempt to "withdraw[] from the encounter."[45]

¶30 Like the constitutional provisions discussing the right of self-defense, this statute is strong evidence of a state public policy favoring self-defense. Of course, the terms of the "Stand Your Ground" statute are not unequivocal—a person who is lawfully located in a place may have a duty to retreat depending on the circumstances. For instance, the statute recognizes a duty to retreat where the person exercising self-defense was engaged in combat by agreement or was the initial aggressor.[46] And a person whose presence on another's property is not lawful—like a trespasser—is not "in a place where" he or she has "lawfully entered or remained," and the person must accordingly retreat under the plain terms of the statute before exercising the right to self-defense.[47]

¶31 We note, however, that the right described in our self-defense statutes and the one recognized in the state constitution do not appear to be coextensive. As we have discussed, Utah did not become a "Stand Your Ground" state until 1994, and if the legislature decided to repeal those provisions of the self-defense statute, we see no reason why that would limit the right of self-defense recognized in article I, sections 1 and 6 of the Utah

---

[42] UTAH CODE § 76-2-401(1)(a).

[43] *Id.* § 76-2-402(1)(a).

[44] *Id.* § 76-2-402(3).

[45] *Id.* § 76-2-402(2)(a)(iii), -402(3).

[46] *Id.* § 76-2-402(2)(a).

[47] *Id.* § 76-2-402(3); *State v. Tuckett*, 2000 UT App 295, ¶ 13, 13 P.3d 1060 (noting that "[u]pon refusing to leave when asked," a criminal defendant "became a trespasser who had a duty to retreat" before engaging in self-defense").

Constitution. After all, Utah law has recognized a somewhat narrower right of self-defense, which included a duty to withdraw, since statehood.[48] In other words, "Stand Your Ground" is not the constitutional minimum. And for purposes of the public policy exception to at-will employment, we construe public policies narrowly, protecting "only those principles which are so substantial and fundamental that there can be virtually no question as to their importance for promotion of the public good."[49] So even if the "Stand Your Ground" statute absolves someone of criminal liability for using force, that does not necessarily mean Utah recognizes a

---

[48] *See* REVISED STATUTES OF UTAH § 75-14-4168(3) (1898) ("Homicide is also justifiable when committed by any person . . . in the lawful defense of such person . . . when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and there is imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mortal combat, *must really and in good faith have endeavored to decline any further struggle* before the homicide was committed . . . ." (emphasis added)). The Territory of Utah adopted a substantially similar law as early as 1876. *See* COMPILED LAWS OF UTAH tit. VIII, ch. I, § 1926 (1876).

The dissent argues that there is "no meaningful difference" between Utah's 1898 self-defense statute and the "Stand-Your-Ground" law passed in 1994. Rather, the dissent believes that both statutes "recognize the so-called right to 'stand your ground' as it currently stands." *Infra* ¶ 101 n.155. The dissent is correct that the duty to retreat outlined in both statutes is similar. But "Stand-Your-Ground" provides that there is no "duty to retreat" from a place where an individual "has lawfully entered or remained," UTAH CODE § 76-2-402(3), language that does not appear in the 1898 statute. Additionally, the 1898 statute is limited to providing a justification for certain homicides committed in self-defense, while our current statute provides a more general defense that applies to any "use of force." *Compare* REVISED STATUTES OF UTAH § 75-14-4168 (1898) (outlining self-defense and defense of others as circumstances under which "[h]omicide is also justifiable"), *with* UTAH CODE § 76-2-402(1)(a) (providing that an individual "is justified in threatening or using force against another" when acting in self-defense or defense of others).

[49] *Rackley*, 2001 UT 32, ¶ 18 (internal quotation marks omitted).

fundamental public policy that encourages that behavior in every circumstance permitted by statute.

¶32  What our constitution and self-defense statutes do suggest is that although Utah recognizes a public policy that strongly supports the right of self-defense, that policy also embodies a duty to retreat in some circumstances before the right may be exercised. And one such circumstance is where an individual's right to engage in self-defense conflicts with property owners' rights to decide who may "lawfully" enter or remain in their home or place of business.[50]

¶33  That is not to say employees defending themselves in the workplace are on the same footing as a trespasser or someone engaged in mutual combat when raising a defense to a criminal prosecution or seeking to establish a public policy exception to at-will employment. Clearly they are not. Rather, it is simply a recognition that authoritative sources of state public policy do not plainly define a right of self-defense that is absolute. So to the extent the Employees suggest that Utah public policy does not contemplate a duty to retreat in the workplace under any circumstances, they are mistaken.

¶34  This conclusion is also supported by Utah common law. Historically, Utah courts have also recognized a broad right of self-defense that, depending on the circumstances, may involve a duty to retreat before it is exercised. Utah courts have long held that "a man has the same right to defend his place of business against intruders as he has to defend his dwelling. He is no more under the necessity of retreating in the one instance than in the other when he is being assailed."[51] But like the "Stand Your Ground" statute, our common law decisions also recognize circumstances in which a person must retreat before engaging in self-defense. For example, as early as 1893, we held that trespassers and initial aggressors have a duty to retreat.[52] In *People v. Hite*, we approved the following jury instruction where a defendant was accused of threatening a homeowner with a gun and then killing the homeowner on his front porch during a shootout: "If . . . the defendant went to the house there wrongfully . . . for the purpose of a quarrel, and by his own acts put himself in that position, . . . it was his duty to retreat . . . and decline any

---

[50] UTAH CONST. art. I, § 1 (recognizing the "inalienable right . . . to acquire, possess, and protect property").

[51] *State v. Turner*, 79 P.2d 46, 54 (Utah 1938).

[52] *People v. Hite*, 33 P. 254, 257 (Terr. Utah 1893).

controversy, if he could with safety."[53] Otherwise, the defendant "could not justify the homicide on the ground of self-defense."[54] Our caselaw, like the "Stand Your Ground" statute, thus articulates a broad right of self-defense that applies at a person's home or place of business, with a limited duty to retreat, depending on the circumstances. These sources are accordingly strong evidence that Utah has a clear and substantial public policy favoring the right of self-defense.

¶35 Wal-Mart nevertheless argues that the "Stand Your Ground" statute does not apply here, because the purpose of the statute was to protect spouses in situations of domestic abuse, not to allow individuals to defend themselves in the workplace. In support, Wal-Mart cites several pieces of legislative history that show the purpose of the statute was to protect abused spouses from having to flee their homes. Specifically, Wal-Mart references a 1994 House Bill amending section 76-2-402, which states,

> Section 2. Legislative Intent.
> Amendments made by this act to Section 76–2–402, regarding self defense, are intended to clarify that justification of the use of force in defense of a person applies equally to all persons including victims of abuse in ongoing relationships.[55]

Additionally, the bill's sponsor, Representative Barth, stated that

> we've made it very clear. Remaining in a relationship does not constitute combat by agreement. If you're a victim, it's sometimes perceived that it's your responsibility to leave, to exit your home; but you have every right to be there and you are the victim of a crime. So we've made it very clear that you have every right to be there.[56]

¶36 Wal-Mart's argument seems to suggest that we should ignore the text of the statute and instead focus on its purpose. As authority for this position, it quotes from our decision in *Hansen*, where we stated that we are "not restricted to parsing statutory text

---

[53] *Id.*

[54] *Id.*

[55] 1994 Utah Laws 281.

[56] Utah State House of Representatives, Floor Deb. on H.B. 13, 50th Utah Leg., Gen. Sess. (Jan. 21, 1994) (Day 5).

and may properly look to many sources, including legislative history, which may illuminate the dimensions of the public policy at issue."[57] But Wal-Mart's argument misinterprets *Hansen*. Although the determination of whether there is clear and substantial public policy is not one of traditional statutory interpretation, it certainly is not the case that we are at liberty to ignore statutory text. Rather, *Hansen* merely establishes that other sources, *in addition* to statutory text, may evidence a public policy.

¶37　Moreover, even if we accept Wal-Mart's argument that one of the purposes of the "Stand Your Ground" act is to allow spouses the option not to retreat, it does not follow that such a purpose is the *only* purpose of the statute. As the House Bill notes, the statute "applies equally to all persons including victims of abuse in ongoing relationships."[58] Nothing in the statement suggests that the statute applies *exclusively* to victims of domestic abuse. And again, the fact that the statute's text is phrased in terms of general applicability, subject to several enumerated exceptions, suggests that its application is not limited solely to domestic disputes.

¶38　In sum, we conclude that the "Stand Your Ground" statute, accompanying statutes that define self-defense, and Utah common law decisions evidence a clear and substantial public policy favoring the right of self-defense. And coupled with the constitutional provisions we have already discussed, we conclude that the right of self-defense is plainly defined by authoritative sources of Utah public policy. This plainly defined policy explicitly recognizes, however, other compelling circumstances in which a person may have a duty to retreat. This factor therefore favors recognizing the policy underpinning the right of self-defense, which sometimes imposes a duty to retreat, as an exception to at-will employment. We now turn to the question of whether this policy is of broad public importance.

*B. The Right of an Employee to Self-Defense Is of Broad Public Importance*

¶39　Even if a public policy is reflected in the Utah Constitution, the Utah Code, and our common law decisions, it is not clear and substantial unless it is "of overarching importance to the public, as opposed to the parties only."[59] Otherwise, we will not find that "the

---

[57] *Hansen*, 2004 UT 62, ¶ 15 n.7.

[58] 1994 Utah Laws 281.

[59] *Retherford*, 844 P.2d at 966 n.9.

public interest is so strong and the policy so clear and weighty that we should place the policy beyond the reach of contract."[60] To determine whether the exercise of a legal right or privilege is of overarching importance to the public, we examine whether the right confers a benefit on the public or "inures solely to the benefit of the employer and employee."[61] Where the legislature has prohibited private parties from waiving the right or privilege by contract, there is strong evidence that the right reflects a clear and substantial public policy,[62] though we may nevertheless recognize a policy exception in the absence of such a clear statutory prohibition.[63] In this case, because the right of self-defense protects human life and deters crime, we conclude that the right is a matter of broad public importance, not merely an internal matter of employer-employee relations.

¶40 A policy favoring the right of self-defense preserves and protects human life. And society places great value on safety and the preservation of human life. In part, this is because the doctrine of self-defense encapsulates the doctrine of defense of others. Under Utah law, "[a] person is justified in threatening or using force against another when and to the extent the person reasonably believes that force or threat of force is necessary to defend the person *or a third person* against another person's imminent use of unlawful force."[64] Our law therefore reflects the common law principle that an "actor is privileged to defend a third person from" harm "under the same conditions and by the same means as those under" which he "is privileged to defend himself."[65] A state policy favoring the right of self-defense therefore protects individuals from serious injuries and deters the completion of crime. Even Wal-Mart concedes that the

---

[60] *Id.*

[61] *Touchard*, 2006 UT 71, ¶ 13.

[62] *See id.* ¶¶ 13, 16 (noting that because the legislature prohibits workers from waiving their workers' compensation rights by contract, such rights reflect a clear and substantial public policy).

[63] *See, e.g.*, *Heslop v. Bank of Utah*, 839 P.2d 828, 837–38 (Utah 1992) (holding that the reporting requirements under the Utah Financial Institutions Act amounted to a clear and substantial public policy even though the act does not expressly mention whether parties can contract around these obligations).

[64] UTAH CODE § 76-2-402(1) (emphasis added).

[65] RESTATEMENT (SECOND) OF TORTS § 76 (1965).

public likely receives at least indirect benefits from the exercise of this important right.

¶41 For these reasons, we agree with the Employees that the doctrine of self-defense and defending others furthers the public good, rather than simply conferring benefits on private parties. We therefore conclude that this factor weighs in favor of recognizing the right of self-defense as an exception to the at-will rule.

¶42 The dissent argues that self-defense is not a matter of overarching importance to the public, but rather a "private matter," providing individuals with "a defense from criminal liability" for "aggressive activity that would otherwise be criminal."[66] And the dissent maintains that for a policy to be of broad public importance, it must "redound unquestionably to the public good."[67] In other words, it must implicate a right upon which "the employer has no legitimate ground for intervening."[68] And the dissent concludes that because the right of self-defense is not "an unmitigated good," employers have legitimate interests in limiting it, and the right therefore does not confer sufficient benefits on the public to qualify as a clear and substantial public policy.[69]

¶43 We concede the right of self-defense may not meet the standard the dissent articulates. But that standard is *not* the one articulated in our caselaw to determine whether a particular legal right or privilege is of overarching importance to the public. The dissent cites *Hansen v. America Online, Inc.* for the proposition that the exercise of a legal right must be one upon which the employer "has no legitimate economic ground for intervening."[70] The *Hansen* court employed that concept, however, to highlight why a public policy exception based on the "exercis[e of] a legal right or privilege" requires an additional analytical step compared to the other categories of public policy exceptions we have recognized.[71] That is, even where a legal right appears plainly defined in authoritative sources and confers substantial benefits on the public at large, a court must still balance the "competing legitimate interests" of the

---

[66] *Infra* ¶ 109.

[67] *Infra* ¶¶ 111–16.

[68] *Infra* ¶ 111.

[69] *Infra* ¶¶ 111–12 (citing *Hansen*, 2004 UT 62, ¶ 10).

[70] *Infra* ¶ 111 (citing *Hansen*, 2004 UT 62, ¶ 10).

[71] *See Hansen*, 2004 UT 62, ¶¶ 9–10.

employer and employee to determine whether the right supports a wrongful discharge claim.[72] The "legitimate economic ground" language had nothing to do with determining whether a legal right qualifies as a matter of broad public importance.

¶44 In *Hansen*, we noted that our caselaw recognizes four categories of public policy exceptions to at-will employment: (1) refusing to commit an illegal or wrongful act, (2) performing a public obligation, (3) exercising a legal right or privilege, and (4) reporting to a public authority criminal activity of the employer.[73] We observed that the first two categories are exceptions to the at-will rule because an employer "owes a duty to an employee . . . not to exploit the employment relationship by demanding that an employee choose between continued employment and violating a law or failing to perform a public obligation of clear and substantial import."[74] And this is because "the extortionate use of termination to coerce an employee to commit unlawful acts or avoid public obligations *serves no legitimate economic objective* and corrodes civil society."[75]

¶45 In contrast, where an employer asks an employee to waive "a legal right or privilege, even a right or privilege which carries strong public policy credentials," we noted that the employee will not be exposed "to possible criminal penalties or other legal sanctions."[76] So such claims will often involve "a balancing of competing legitimate interests: the interests of the employer to regulate the workplace environment . . . and the interests of the employees to maximize access to their statutory and constitutional rights within the workplace."[77]

¶46 Thus, the language in *Hansen* the dissent cites indicates when courts must balance the competing interests of the employee and the employer. It does not speak to whether a legal right or privilege implicates a matter of broad public importance. So even though employers have legitimate economic reasons to limit the conditions under which their employees may engage in self-defense,

---

[72] *See id.* ¶ 11.

[73] *Id.* ¶ 9.

[74] *Id.* ¶ 10.

[75] *Id.* (emphasis added).

[76] *Id.* ¶ 11.

[77] *Id.*

that does not alter our conclusion that the right is of overarching importance to the public. Instead, it requires that our analysis not end with the conclusion that the right of self-defense is both plainly defined in authoritative sources and a matter of broad public importance. We must then carefully balance the Employees' interest in exercising that right against Wal-Mart's interest in regulating its workforce and private property. It is that question to which we now turn.

### C. The Right of Self-Defense Outweighs the Countervailing Interest of Wal-Mart to Regulate the Workplace

¶47  Having concluded that the first two factors weigh in favor of recognizing the right of self-defense as a clear and substantial public policy exception to at-will employment, we now turn to the third factor: whether the public policy outweighs employers' interest in being able "to manage their workforces and regulate their workplace environments to promote productivity, security, and similar lawful business objectives."[78] Wal-Mart argues that self-defense does not outweigh employers' interest in maintaining a safe workplace through non-confrontation and de-escalation policies. Additionally, it claims that our decision in *Hansen* already weighed these competing policies in employers' favor and that virtually every jurisdiction to decide the issue has refused to recognize a self-defense exception to at-will employment. We reject these arguments and conclude that employers' interests do not outweigh the right of individuals to defend themselves. But because the public policy reflected in Utah self-defense law recognizes a duty to retreat in some circumstances, and because Wal-Mart has strong interests in regulating its workforce and property, our decision is limited to circumstances in which an employee faces an imminent threat of serious bodily harm and has no opportunity to withdraw.

¶48  Wal-Mart maintains that Utah has a strong public policy in favor of de-escalation and non-confrontation policies that outweighs an employee's right of self-defense. In support, Wal-Mart cites to a number of sources. For instance, the Utah Occupational Safety and Health Agency found that "[b]ehavioral strategies for workplace violence prevention suggest training employees in nonviolent response and conflict resolution."[79] The Utah Code also requires that

---

[78] *Touchard*, 2006 UT 71, ¶ 17, 148 P.3d 945 (internal quotation marks omitted).

[79] UTAH OCCUPATIONAL HEALTH AND SAFETY DIVISION, UOSH SAFETY LINE NEWSLETTER (Nov. 2010), *available at* http://laborcommi

(Continued)

"employer[s] . . . furnish to each of [their] employees . . . a place of employment that [is] free from recognized hazards that are causing or are likely to cause death or physical harm."[80] Moreover, multiple federal agencies, such as the Occupational Safety and Health Administration and the National Institute for Occupational Safety and Health, have recommended that employers maintain policies requiring non-resistance during robberies, as well as training in nonviolent response.[81] Wal-Mart argues that its Policy AP-09 is in line with such recommendations.

¶49 These policies are undoubtedly important, and Wal-Mart argues that recognizing a public policy exception for the right of self-defense "would obliterate employers' ability" to implement them. In particular, it claims that because self-defense is a factually intensive issue, employers will never be certain if they can terminate an employee without facing a possible wrongful termination lawsuit. Employees will then be able to flout de-escalation policies with impunity because the benefits to the employer of enforcing these policies will not outweigh the likely cost of litigating the wrongful termination claims of every employee terminated for failing to follow them. As a result, Wal-Mart argues, employers may scrap de-escalation and non-confrontation policies altogether.

---

ssion.utah.gov/media/pdfs/uosha/pubs/newsletters/newsletters2010/112010 Safety Line.pdf (last visited Aug. 13, 2015).

[80] UTAH CODE § 34A-6-201(1).

[81] OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, RECOMMENDATIONS FOR WORKPLACE VIOLENCE PREVENTION PROGRAMS IN LATE-NIGHT RETAIL ESTABLISHMENTS (OSHA 3153-12R), at 11 (2009), *available at* https://www.osha.gov/Publications/osha3153.pdf (last visited Aug. 13, 2015) (recommending that workplace safety training should include "[s]pecific instructions on how to respond to a robbery such as turning over money or valuables without resistance"); THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH, PREVENTING HOMICIDE IN THE WORKPLACE (PUB. NO. 93-109) (May 1995), *available at* http://www.cdc.gov/niosh/docs/93-109 (last visited Aug. 13, 2015) (stating that preventative measures to reduce workplace homicides include "[p]rovid[ing] training in conflict resolution and nonviolent response [and] . . . [a]void[ing] resistance during robbery").

¶50 We agree with Wal-Mart that employers have a strong interest in preventing employees from using force in the workplace, even in self-defense. To some extent, by requiring trespassers to retreat before engaging in self-defense, Utah law recognizes the importance of allowing business owners to regulate access to and use of their property.[82] As Wal-Mart points out, this interest is also recognized in statutes and regulations at both the state and federal level. And Wal-Mart's argument that employers will be subject to expensive litigation if employees are allowed to exercise self-defense is particularly weighty.

¶51 But ultimately, we believe that the public policy favoring the right of self-defense outweighs these interests, at least in the narrow circumstances presented in this case. For purposes of certifying the question in this case to us, the federal district court assumed that all the Employees were "unable to safely disengage" from a threat of violence. In such circumstances, the employee faces the prospect of severe injury or death with no opportunity to withdraw. Under Utah's "Stand Your Ground" statute and Utah's common law decisions, even an initial aggressor or trespasser who makes a good faith effort to flee may still engage in self-defense if there is no opportunity to safely withdraw.[83] The law should not require employees to choose between keeping their jobs and protecting themselves or others from a serious, imminent threat of harm. And in light of the impressive constitutional and statutory pedigree the right of self-defense enjoys in our state,[84] we hold that Utah law does not require employees to make that choice. Consequently, where an at-will employee is unable to withdraw from an imminent threat of death or serious bodily harm, the employer may not terminate the employee for exercising the right of self-defense. And employees fired for defending themselves in such circumstances may bring a wrongful termination claim against their employer.

¶52 In so holding, we note that Wal-Mart's policy may be consistent with the clear and substantial public policy exception we

---

[82] *See supra* ¶¶ 27–30.

[83] *See* UTAH CODE § 76-2-402(2)(a)(iii), (3); *People v. Hite*, 33 P. 254, 257 (Terr. Utah 1893) ("If it appears from the evidence . . . that the defendant went to the house there wrongfully . . . it was his duty to retreat from that, and decline any controversy, if he could with safety. He was not bound to run away, and take a shot in the back.").

[84] *See supra* ¶¶ 21–28, 29–31.

recognize today. Policy AP-09 explicitly allows employees to "defend themselves or others to the extent necessary to disengage the Suspect, withdraw from the situation and contact law enforcement." Although it does not say so explicitly, this language implies that an employee who had no opportunity to "disengage" and "withdraw from the situation" would be entitled to defend themselves. Further, there is no reason why Wal-Mart and other employers cannot continue to train their employees to disengage and withdraw from dangerous situations when there is no imminent threat of serious bodily injury or a reasonable opportunity to withdraw—in such a situation, we hold that an employer's interest in regulating its workforce and property outweighs employees' interest in defending themselves without fear of being terminated.

¶53 The dissent raises two primary objections to this conclusion, arguing that (1) the public policy we recognize is "not the right enshrined in our law," but a "new one, tailored to the employment context" that is unsupported by any of our "cited authorities,"[85] and (2) our ruling is premised largely on an inappropriate assumption that the Employees were unable to withdraw.[86] We address each of these arguments in turn.

¶54 The dissent's first argument is inconsistent with the way we have applied the doctrine since its inception. As we have discussed, at-will employment and exceptions to it are common law rules that do not depend on statutes or other statements of positive law for their authority.[87] For that reason, public policy exceptions need not be coextensive with the statutes or constitutional provisions upon which they are based.[88]

---

[85] *Infra* ¶¶ 91, 92, 95.

[86] *Infra* ¶¶ 82, 117–22.

[87] *See supra* ¶ 23.

[88] *See, e.g., Hansen*, 2004 UT 62, ¶ 15 n.7 (noting that in analyzing whether a public policy is plainly defined in authoritative sources of Utah law, "the issue before us is not one of statutory interpretation," so "the centerpiece of our inquiry is the strength and scope of public policy" and "our efforts to assay this question" are accordingly "not restricted to parsing statutory text"); *Rackley*, 2001 UT 32, ¶ 10 ("We agree with plaintiff that if we were to require the law to be so specifically tailored, the public policy exception would be meaningless.").

¶55 For example, in *Peterson v. Browning*, we held that a private employer could not terminate an employee for *refusing to violate* state tax law and federal customs law.[89] In support, we cited the Utah Protection of Public Employees Act, which protects public employees from being discharged for "*reporting* a violation of a law, or rule promulgated under the law of this state, a political subdivision of this state, or any recognized entity of the United States."[90] We noted that even though "the statute does not specifically limit the rights of private employers or address the employer who directs an employee to engage in unlawful conduct," it reflected "legislative approval of the basic proposition that it is against the public policy of the state for employers to discharge employees who seek to act within the law."[91]

¶56 Similarly, in *Heslop v. Bank of Utah*,[92] we recognized a public policy exception based on a statute that said nothing about the employer-employee relationship. In that case, we held that a bank employee could not be terminated for making an internal report about the bank's noncompliance with state reporting requirements.[93] The authoritative source we relied on to "plainly define" the public policy at issue was section 7-1-318 of the Utah Financial Institutions Act, which "makes failure or refusal to submit accurate and timely call reports" to state regulators "a third degree felony."[94] But nothing in the Act prohibited an employer from firing someone for reporting a violation, and none of its provisions regulated the employee-employer relationship in any respect.[95]

¶57 More recently, in *Touchard v. La-Z-Boy Inc.*, we rejected a company's argument that the lack of an anti-retaliation provision in the Workers' Compensation Act precluded us from crafting a public policy exception that would prevent employers from firing workers for seeking workers' compensation benefits.[96] We noted that because

---

[89] 832 P.2d at 1283.

[90] *Id.* at 1281 n.2 (emphasis added) (internal quotation marks omitted).

[91] *Id.*

[92] 839 P.2d 828.

[93] *Id.* at 838.

[94] *Id.* at 837.

[95] *See* UTAH CODE § 7-1-318.

[96] 2006 UT 71, ¶ 21.

"wrongful discharge is a common law claim," the absence of such a provision "does not affect this court's ability to recognize this state's public policy for purposes of a wrongful discharge cause of action."[97] We then held that Utah law reflects a clear and substantial public policy prohibiting employers from terminating a worker for seeking benefits guaranteed by the Act.[98]

¶58 In two of these cases, we recognized public policy exceptions based on statutes that did not regulate employment. And in all three, the scope of each exception exceeded the statement of positive law upon which it was based. So to the extent the dissent suggests that public policy exceptions must be coextensive with statements of positive law, that assertion is inconsistent with the nature of the doctrine as well as our holdings in several cases.

¶59 Moreover, if employees could rely only on those sources that explicitly regulate the employment relationship to establish a public policy exception, it would render the public policy exception effectively meaningless. For almost two decades, we have recognized three ways an employee can rebut the presumption of at-will employment:

> (1) there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of [some] agreed-upon condition; (2) a statute or regulation restricts the right of an employer to terminate an employee under certain conditions; or (3) the termination of employment constitutes a violation of a clear and substantial public policy.[99]

If the only statutes that qualify as an authoritative source of public policy are those that directly regulate the employee-employer relationship, it seems likely that many of them would be statutes that "restrict[] the right of an employer to terminate an employee under certain conditions."[100] Consequently, limiting our analysis to only those sources of law that directly regulate employment would require us to overrule much of our precedent in this area of the law.

---

[97] *Id.*

[98] *Id.* ¶ 19.

[99] *Hansen*, 2004 UT 62, ¶ 7 (internal quotation marks omitted); *accord Touchard*, 2006 UT 71, ¶ 3; *Fox v. MCI Commc'ns Corp.*, 931 P.2d 857, 859 (Utah 1997).

[100] *See Touchard*, 2006 UT 71, ¶ 3.

¶60 The dissent next argues that our ruling is the result of how we have "frame[d]" the question.[101] In particular, the dissent believes our assumption "that the Employees were unable to safely disengage" is "not an element of the question certified for our review," but rather "an outgrowth of the summary judgment posture of the case as it currently stands."[102] And because the dissent thinks it likely that none of the Employees in this case and very few in future cases would be fired under circumstances where they were unable to withdraw form imminent harm, the dissent would leave it to employers to decide whether employees were justified in defending themselves.[103]

¶61 This argument is unpersuasive for two reasons. First, because this case requires us to answer a certified question, there is no need to "frame" the question ourselves; the federal district court has already done that for us. And our opinion simply quotes the legal question put to us by the federal district court along with the factual circumstances it asked us to assume for purposes of answering that question.

¶62 The district court's order of certification frames the question as follows: "Is the right of self-defense a substantial public policy exception to the at-will employment doctrine, which provides the basis for a wrongful discharge action?" And the order references the court's memorandum decision, which includes a section entitled, "Facts Assumed to Be True for Certification." The district court notes that there is a factual dispute about whether the Employees could safely withdraw, but "before a jury may resolve these disputed factual issues, the court must first ascertain that there is a legal basis on which the Plaintiffs may proceed. Accordingly, the court assumes for purposes of certifying the self-defense question to the Utah Supreme court" that the Employees "were unable to safely disengage." So even if the dissent is correct that these assumed facts represent an "outlier case,"[104] it is nevertheless the case squarely presented to us by the certified question. And moreover, this

---

[101] *Infra* ¶ 80.

[102] *Infra* ¶ 81.

[103] *Infra* ¶¶ 82 n.140, 82–83, 116–20.

[104] *Infra* ¶ 119.

practice — of presenting a state court with assumed facts for purposes of answering a certified question — is a standard one.[105]

¶63 Second, the dissent allows speculation about what a jury might decide drive its analysis of the certified question. Even if it is likely, as the dissent maintains, that Wal-Mart will ultimately prove that the Employees "fought back unnecessarily,"[106] this is a decision appropriately left to the jury. The dissent acknowledges that "we do not know exactly what happened in the confrontations that led to the wrongful termination claims against Wal-Mart,"[107] and that our "approach might make sense in a case in which it is undisputed that an employee has no possible means of withdrawal."[108] But rather than simply accept the facts the federal district court asked us to assume for purposes of certification, the dissent argues that "the record on summary judgment supports the conclusion that Wal-Mart made a reasonable judgment in concluding that its employees fought back when they could have reasonably disengaged"[109] and concludes that this "is easily enough to defeat the public policy basis for a claim for wrongful termination in this case."[110] We leave this question to the jury. And far from "loading the dice in favor" of the Employees,[111] we are merely making the assumptions the district court has asked us to make, rather than venturing into speculation.

¶64 When presented with a certified question, our role is to simply "answer the legal questions presented without resolving the underlying dispute."[112] It is certainly true, as the federal district court acknowledged, that the Employees "may fail to convince a jury

---

[105] *See, e.g.*, *Stone v. Smith, Kline & French Labs.*, 447 So. 2d 1301, 1301–03 (Ala. 1984); *Wash. Metro. Area Transit Auth. v. Johnson*, 726 A.2d 172, 173–74 (D.C. 1999); *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 548 N.E.2d 182, 184 (Mass. 1990); *Horn v. S. Union Co.*, 907 A.2d 691, 691 (R.I. 2006) (mem.).

[106] *Infra* ¶ 118.

[107] *Infra* ¶ 83.

[108] *Infra* ¶ 82 n.140.

[109] *Infra* ¶ 83.

[110] *Infra* ¶ 83.

[111] *Infra* ¶ 82.

[112] *Iverson v. State Farm Mut. Ins. Co.*, 2011 UT 34, ¶ 8, 256 P.3d 222 (internal quotation marks omitted).

of these facts, and therefore Wal-Mart may win its case even if the Plaintiffs are allowed to proceed on their self-defense theory." But such a determination is one for a future federal jury to make, not this court. The dissent's approach would therefore allow speculation about what a jury might find drive our answer to the certified question, which inappropriately steps in to the jury's role and ignores the federal district court's explicit request that we assume certain facts to be true for purposes of resolving unsettled issues of state law.

¶65 Moreover, in holding otherwise, we are not resolving any underlying factual disputes or "loading the dice" in favor of employees; we are letting them have their day in court to prove a claim the dissent acknowledges "makes sense" in circumstances where "an employee has no possible means of withdrawal." By contrast, the dissent's approach would simply trust employers to make the appropriate decision on whether an employee acted in reasonable self-defense or retaliation, and the dissent asserts "[i]t would be the rare employer . . . who would actually fire an employee for defending himself in the face of a threat of 'severe injury or death with no opportunity to withdraw.'"[113] That may or may not be true. But speculation about employers' personnel decisions is not relevant to deciding whether self-defense is the kind of clear and substantial public policy that qualifies as an exception to the at-will rule.[114]

¶66 Finally, we note that our decision today is consistent with persuasive authority from other jurisdictions. Wal-Mart maintains that virtually every jurisdiction to consider the issue has determined that employers' rights to manage their workforce and create a safe environment outweigh employees' right of self-defense. And it urges us to adopt the reasoning in these decisions. In support, it cites cases

---

[113] *Infra* ¶ 118.

[114] The dissent characterizes our holding as prohibiting "the matter addressed by Wal-Mart's de-escalation policy" from being "a proper subject of voluntary contract." *See infra* ¶ 84 n.143. This overstates the scope of our holding. Employees may only raise the public policy exception we recognize today when they have no opportunity to withdraw from serious imminent harm. As we have discussed, nothing in our decision today prohibits employers from requiring their employees to disengage from violent situations when they have such an opportunity. *See supra* ¶ 52.

from Pennsylvania,[115] Maryland,[116] North Carolina,[117] and two federal district courts.[118] The courts in each case declined to recognize a self-defense exception to at-will employment.[119] But several of these cases are distinguishable, and we find the reasoning of another case from West Virginia[120] more persuasive.

¶67 The policy-weighing analysis in both the Maryland case and the federal district court decisions are distinguishable because they involve a much more expansive view of self-defense than the Employees assert in this case. The plaintiffs in these cases articulated a right of self-defense that encompassed instances where employees used force in retaliation or in circumstances where there was an opportunity to withdraw. In *Bagwell v. Peninsula Regional Medical Center*, the Maryland Court of Special Appeals concluded that an employee terminated by a hospital could not base a wrongful termination claim on the fact that she was fired for defending

---

[115] *Scott v. Extracorporeal, Inc.*, 545 A.2d 334, 342–43 (Pa. Super. Ct. 1988) (refusing to recognize a self-defense exception to at-will employment because "the public policy asserted by appellant—the right to exercise self-defense—strikes entirely too near the employer's legitimate interest in discharging employees it perceives to be disruptive").

[116] *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 312–13 (Md. 1995).

[117] *McLaughlin v. Barclays Am. Corp.*, 382 S.E.2d 836, 840 (N.C. Ct. App. 1989) (declining to recognize a self-defense exception to at-will employment because the court did "not perceive" any substantial "deleterious consequences for the general public").

[118] *Hoven v. Walgreen Co.*, No. 1:11-cv-881, 2012 WL 6025790, at *5 (W.D. Mich. Dec. 4, 2012) (dismissing cause of action for wrongful determination where an employee fired a gun during an attempted robbery, because the constitutional provisions and statutes upon which the plaintiff relied "are not directed at conferring rights on employees" (internal quotation marks omitted)); *Johnson v. CVS Pharmacy, Inc.*, No. C 10-03232, 2011 WL 4802952, at *5 (N.D. Cal. Oct. 11, 2011) (declining to recognize a self-defense public policy exception to at-will employment because the "state courts in California" had not "authoritatively establish[ed]" such a claim).

[119] *See supra* nn. 115–18.

[120] *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713 (W. Va. 2001).

herself.[121] But the court also noted that "*all* the evidence" in the case "points to the conclusion" that the hospital fired the employee because it believed she "acted in retaliation," not self-defense.[122] Similarly, in *Johnson v. CVS Pharmacy*, five employees were fired after physical altercations and name-calling throughout the day culminated in a brawl at the back of the store.[123] The Northern District of California held that the employees did not have a wrongful discharge claim and expressed reluctance "to recognize such [wrongful termination claim], at least on the facts here."[124]

¶68 The competing policies in *Bagwell* and *Johnson* differ in important ways from the policies at issue here. In each case, the plaintiffs articulated a right of self-defense that extended to situations where employees used force in retaliation or in circumstances where it would have been safe to withdraw and contact law enforcement. And the courts ultimately determined that the relative benefits of such a broad right of self-defense were outweighed by the employers' countervailing interests. Here, by contrast, the certified question requires us to assume that the Employees acted to defend themselves and had no opportunity to escape. So the manner in which the courts in those cases weighed the competing policy concerns is not particularly instructive on how we should weigh de-escalation and non-confrontation policies against a much narrower right of self-defense.

¶69 The other federal district court case Wal-Mart cites also involves a much broader right of self-defense. In *Hoven v. Walgreen Co.*, the Western District of Michigan concluded that a pharmacist who was terminated for firing a gun during an armed robbery could not maintain a wrongful termination claim.[125] The court noted that Michigan law places restrictions on the possession and use of firearms in the workplace, so the plaintiff could not argue that Michigan law evinces a public policy supporting his conduct.[126] But here, none of the Employees used a firearm.

---

[121] 665 A.2d at 312.

[122] *Id.* at 313.

[123] 2011 WL 4802952, at *1–*2.

[124] *Id.* at *5.

[125] 2012 WL 6025790, at *1, *4–*5.

[126] *Id.* at *5.

¶70 The other cases Wal-Mart cites are on point, but as we discuss in more detail below, we find the reasoning from a West Virginia case to be more persuasive. Decisions in Pennsylvania and North Carolina express skepticism that the judiciary should be involved in deciding whether an employee was justifiably terminated for using force in the workplace. In *Scott v. Extracorporeal, Inc.*, an employee was fired after a coworker knocked her unconscious, even though the employee "either acted in self-defense or never landed a blow."[127] The Pennsylvania Superior Court concluded that recognizing a self-defense exception to at-will employment "would have the unwise effect of transferring to the judicial forum the duty of evaluating the propriety of management decisions."[128] Similarly, in *McLaughlin v. Barclays American Corp.*, the Court of Appeals of North Carolina affirmed the dismissal of a manager's wrongful discharge cause of action where the manager accidentally hit an employee who was attacking him.[129] The court reasoned that recognizing a self-defense exception to at-will employment would allow "every employee involved in an altercation" to "assert a self-defense justification, spawning [a] . . . deluge" of wrongful termination litigation.[130]

¶71 As we have already noted, these concerns are not unwarranted. But we weigh the relevant policy concerns differently, as did the Supreme Court of West Virginia in *Feliciano v. 7-Eleven, Inc.* In that case, a cashier was fired after she disarmed a robber and restrained him until law enforcement arrived.[131] Somewhat similar to Wal-Mart's Policy AP-09, 7-Eleven's policy prohibited "employees from subduing or otherwise interfering with a store robbery."[132] While acknowledging that employers have "an interest in protecting [their] staff and customers from harm that may befall them as a result of the employee's actions in defending him/herself,"[133] the West Virginia Supreme Court concluded that self-defense was the type of clear and substantial public policy that qualified as an

---

[127] 545 A.2d at 335, 342.

[128] *Id.* at 343 (internal quotation marks omitted).

[129] 382 S.E.2d at 837–38, 840.

[130] *Id.* at 840.

[131] 559 S.E.2d at 716–17.

[132] *Id.* at 716.

[133] *Id.* at 722.

exception to at-will employment.[134] But because of the "very real possibility" that employees may harm coworkers or innocent bystanders when exercising the right of self-defense, the court limited the public policy exception to instances where an employee responds to "lethal imminent danger."[135]

¶72 Wal-Mart attempts to distinguish *Feliciano* by claiming that the result was driven by idiosyncratic feature of West Virginia law. Specifically, Wal-Mart refers to the West Virginia Supreme Court's statement that the right of self-defense had previously been recognized to extend to one's place of employment in its prior caselaw: "In defending himself, his family or his property from the assault of an intruder, one is not limited to his immediate home or castle; his right to stand his ground in defense thereof without retreating extends to his place of business also."[136] Wal-Mart maintains that Utah common law recognizes no such right. But in fact, our precedent mirrors West Virginia law on this issue. We have stated that "a man has the same right to defend his place of business against intruders as he has to defend his dwelling. He is no more under the necessity of retreating in the one instance than in the other when he is being assailed."[137] *Feliciano* is therefore directly on point, and its reasoning supports the decision we reach today.

¶73 In sum, we conclude that an individual's right of self-defense outweighs an employers' interest in regulating its workforce and property through de-escalation and non-confrontation policies. Thus, this factor weighs in favor of recognizing the state policy supporting this important right as the kind of clear and substantial public policy that qualifies as an exception to the at-will employment doctrine. And because the other two factors also support recognition of such an exception, we answer the certified question in the affirmative—an employee may maintain a wrongful termination claim against an employer where the employee is fired for engaging in self-defense, but only if the employee faced an imminent threat of serious bodily harm under circumstances where he or she was unable to safely withdraw.

---

[134] *Id.* at 722–23.

[135] *Id.* at 723.

[136] *Id.* at 722 (quoting *State v. Laura*, 116 S.E. 251 (W. Va. 1923)).

[137] *State v. Turner*, 79 P.2d 46, 54 (Utah 1938).

**Conclusion**

¶74  We conclude that Utah law recognizes a policy favoring the right of self-defense, and that policy is the kind of clear and substantial public policy that qualifies as an exception to the at-will employment doctrine. Accordingly, an at-will employee who is fired for exercising that right may maintain a wrongful termination action, but only if the employee faced an imminent threat of serious bodily harm in circumstances where he or she was unable to withdraw. We so hold because (1) Utah law strongly supports the right of self-defense while recognizing circumstances in which a person may have a duty to withdraw; (2) a policy favoring the right of self-defense is also of broad public importance because it protects human life while deterring crime; and (3) despite the strong interests employers have in maintaining a safe workplace through de-escalation policies, the right of individuals to defend themselves against imminent bodily injury or death is simply more compelling where the employee cannot safely withdraw. We therefore answer the certified question in the affirmative.

---

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶75  Wal-Mart Stores has adopted a policy of non-resistance for employees confronted with workplace violence. The policy directs Wal-Mart associates to "disengage" and "withdraw" when confronted with a weapon. It also reserves their right to "defend themselves or others"—but only "to the extent necessary" to disengage.

¶76 Wal-Mart's policy follows recommendations of the Occupational Safety and Health Administration and the National Institute for Occupational Safety and Health. *See supra* ¶ 48. Those organizations, and doubtless many others, recommend that workers receive training in "how to respond to a robbery" by "turning over money or valuables without resistance."[138] The Wal-Mart

---

[138] OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION, RECOMMENDATIONS FOR WORKPLACE VIOLENCE PREVENTION PROGRAMS IN LATE-NIGHT RETAIL ESTABLISHMENTS (OSHA 3153-12R), at 11 (2009); *see also* NAT'L INST. FOR OCCUPATIONAL SAFETY & DISEASE, PUB. NO. 93-109: PREVENTING HOMICIDE IN THE WORKPLACE, CDC.GOV (May 1995), *available at* http://www.cdc.gov/niosh/docs/93-109/ (discussing recommended preventive measures aimed at reducing workplace homicides, including "[p]rovid[ing] training in conflict resolution

(Continued)

approach—of disengagement and withdrawal—appears to be a fairly standard practice in retail establishments throughout the country.[139]

¶77 Where, as here, the workers in question are at-will employees, the Wal-Mart policy includes a further (implied) element: The employer has the final say in the event of disagreement as to whether the employee was engaged in proper self-defense or prohibited escalation, and a concomitant right to terminate the employee if it decides that the policy was violated.

¶78 The question presented concerns the enforceability of the foregoing arrangement. That question, in my view, is not simply whether Utah law favors a right of self-defense. It is whether an employment agreement along the lines outlined above—with a worker's duty to withdraw when confronted with a weapon, a right of self-defense when withdrawal is not reasonably possible, and the employer retaining the final say on whether the policy was followed—is a matter where our state "public interest is *so strong* and the policy *so clear and weighty* that we should place the policy beyond the reach" of a voluntary contract. *Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 13, 148 P.3d 945 (emphasis added) (internal quotation marks omitted).

¶79 I would uphold the viability of Wal-Mart's policy under that standard. Thus, I would conclude that Utah's public interest in preserving a right of self-defense is insufficient to override Wal-Mart's legitimate interests in holding its workers to the policy at issue.

¶80 The majority frames the question differently. It asks whether our public policy sustains a right to maintain a wrongful termination claim where "the employee faced an imminent threat of serious bodily harm in circumstances where he or she was unable to safely withdraw." *Supra* ¶ 73. And it roots that formulation in the fact that the federal district court "assume[d] that the Employees were unable to safely disengage" from the confrontations they faced. *Supra* ¶ 7.

---

and nonviolent response [and] [a]void[ing] resistance during robbery").

[139] *See, e.g., Hoven v. Walgreen Co.*, 751 F.3d 778, 781 (6th Cir. 2014) (challenge to Walgreen Co.'s de-escalation policy); *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 716 (W. Va. 2001) (challenge to 7-Eleven's policy prohibiting employees from interfering with a store robbery).

¶81 That assumption, however, is not an element of the question certified for our review. It is an outgrowth of the summary judgment posture of the case as it currently stands. The certified question presented is whether the "right of self-defense" sustains a "public policy exception to the at-will employment doctrine that provides a basis for a wrongful discharge action" in this case. In analyzing that question, we cannot properly *assume* that the employees in question "reasonably believe[d] that force [was] necessary to defend against an imminent threat of serious bodily harm and . . . ha[d] no opportunity to withdraw." *Supra* ¶ 2. Our role in answering certified questions is "not to issue abstract, advisory opinions on general matters of interest to the federal courts." *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 8, 289 P.3d 502. "It is to resolve disputed questions of state law in a context and manner useful to the resolution of a pending federal case." *Id*. To do so, we have not only a right but a responsibility to frame the question presented in a manner "facilitating the disposition of the underlying federal case." *Id*. ¶ 9.

¶82 At this stage of the case, we do not know whether the employee-plaintiffs responded reasonably to an imminent threat or overreacted in the face of a meaningful path for retreat. I would not resolve that doubt by reference to the summary judgment posture of the case (which yields the benefit of the doubt to the nonmoving parties). That move ends up loading the dice in favor of what I see as the less likely scenario in this and in the broad run of cases. Instead, I would take a step back and frame the question presented in more general terms—of whether an express agreement to give the employer the final say in the event of factual disagreement is a matter where our state public policy is so clear and weighty that we should place the matter beyond the reach of a voluntary contract.[140]

---

[140] The majority's approach might make sense in a case in which it is undisputed that an employee has no possible means of withdrawal. In that event—in a case in which an employee is fired for refusing to take a bullet for his pacifist employer—I could understand the court's notion that the employer's interests are outweighed by our public policy favoring self-defense. *See McLaughlin v. Barclays Am. Corp.*, 382 S.E.2d 836, 840 (N.C. Ct. App. 1989) (rejecting public policy basis for wrongful termination claim in a case in which the employer made a good faith determination that the employee's act of self-defense was not necessary under the circumstances, while leaving open the possibility that a valid claim could be made in a case in which the employer's decision could be

(Continued)

A.C.J. Lee, dissenting

¶83 While the federal district court assumed that the employees faced an imminent threat and had no opportunity to withdraw in light of the summary judgment posture of the case, the reality is that we do not know exactly what happened in the confrontations that led to the wrongful termination claims against Wal-Mart. And at a minimum, the record on summary judgment supports the conclusion that Wal-Mart made a reasonable judgment in concluding that its employees fought back when they reasonably could have disengaged.[141] For me that is easily enough to defeat the public policy basis for a claim for wrongful termination in this case.[142]

---

shown to have been made in bad faith). But such a case seems terribly unlikely. In most every case in which an employee is fired for fighting back, I suspect it will be because the employer reasonably believes that the employee's response was unreasonable—that disengagement and withdrawal were reasonably possible, and that the worker's response was therefore unnecessary. *Cf.* Margaret Raymond, *Looking for Trouble: Framing and the Dignitary Interest in the Law of Self-Defense*, 71 OHIO ST. L.J. 287, 293 (2010) (observing that "[s]elf-defense cases" in criminal law "rarely reflect" simple, easy-to-discern facts, but are usually "complex and ambiguous" as to the intentions and actions of the parties).

That (usual) circumstance is one in which the employer's interests easily outweigh the employee's. Even the majority concedes that point. *See supra* ¶¶ 15, 18. Yet the court's holding—allowing an employee to file a wrongful termination claim to seek to establish the reasonableness of any act of self-defense in the workplace—seems tailored to the opposite (unusual) circumstance.

[141] As the majority acknowledges, the shoplifter who confronted Derek Holt and Eric Hunter "pulled out a small pocketknife and shouted that she was going to stab [them] *if they did not let go*." *Supra* ¶ 4 (emphasis added). Yet Holt and Hunter "maintained their hold . . . and a customer helped pry the knife out of the shoplifter's hand." *Supra* ¶ 4. In so doing they were at least arguably in direct violation of Wal-Mart's policy. The shoplifter's statement is not an unconditional threat of violence. It is a conditional threat—a "money or your life [or limb]" offer. And this is precisely the circumstance that Wal-Mart's policy is aimed at—at directing its associates to turn over merchandise instead of fighting back, in an effort to minimize the risk of workplace violence.

The incident involving Shawn Ray, Lori Poulsen, and Gabriel Stewart is a bit more ambiguous. As the court notes, the employees' version of what happened is different from Wal-Mart's. But again

(Continued)

¶84  I recognize that these are matters in dispute. And I concede that under our criminal law of self-defense, the employee-plaintiffs

---

there is good reason to believe that Wal-Mart's policy was violated. Under either version of the facts, the shoplifter's reference to his gun seems to be a plea to allow him to walk away with the laptop—again with a *conditional* threat of violence. Even under the employees' account of the confrontation, the shoplifter made a vague reference to his gun and said "Don't make me do this!" Under Wal-Mart's policy, the proper response to that reference would have been to withdraw and disengage. But, even according to the employees, they confronted the shoplifter—with Poulsen's shout of "Gun! Hand!" and an ensuing physical skirmish. *See supra* ¶ 6. That was at least arguably a breach of Wal-Mart's policy, which understandably required the Wal-Mart associates to disengage and let the shoplifter walk away with the laptop when he displayed or made reference to a gun.

[142] The point of this discussion is not to "speculat[e] about what a jury might decide" in resolving the certified question. *Supra* ¶ 63. It is to assess a key aspect of the state law question as I understand it—which is whether the arrangement Wal-Mart has with its employees is a matter that must be placed beyond the reach of contract. If we can identify routine applications of the Wal-Mart policy in which the employee has a legal right of self-defense but the employer may reasonably prefer withdrawal, it seems easy to conclude that this is a proper matter for voluntary agreement (and, accordingly, not a proper case for a public policy basis for a right to sue for wrongful termination). That is the point of the above discussion.

The federal court's contrary "assumption" about the facts is not a finding, or even an acceptance of the employees' allegations. It is just a reflection of the procedural posture of the case. We should, of course, acknowledge that posture. But if we were evaluating these employee-plaintiffs' right to sue for wrongful termination on their motion for summary judgment, I would not conclude that they would eventually succeed in proving that they were unable to safely disengage. I would acknowledge the reality that the answer to that question is uncertain. And I would take that reality into account in concluding that it is reasonable for an employer to adopt a workplace de-escalation policy like Wal-Mart's—or at least not so unreasonable that we can conclude that state policy is "so strong and the policy so clear and weighty that we should place the policy beyond the reach" of a voluntary contract. *Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 13, 148 P.3d 945 (internal quotation marks omitted).

were fully justified in their response to the violence they faced in the workplace. But that is not the issue before us.[143] The question, rather, is whether our public policy of self-defense is sufficient to override the right of an employer and employee to agree to give the employer the final say in case of doubt about the reasonableness of an employee's act of self-defense in the workplace. That is the arrangement Wal-Mart entered into with its associates—under Policy AP-09, when read against the presumption of at-will employment. And that arrangement seems perfectly reasonable to me, particularly given the high stakes—and substantial risk—inherent in the contrary approach.

¶85 In resolving the matter the other way, the majority jeopardizes the ability of employers to adopt and enforce workplace violence policies like the one adopted by Wal-Mart (and countless other retailers). By ruling that employees have a right to assert wrongful termination claims in cases where they disagree with their employer's assessment of the reasonableness of a response to workplace violence, the majority assures that a substantial percentage of doubtful cases will be resolved in favor of the

---

[143] My approach is not aimed at "step[ping] in to the jury's role" or at "speculat[ing] about what a jury might find" in this case. *Supra* ¶ 64. It is to consider the facts of this case in answering the question of state law that is presented. That question requires us to ask whether Wal-Mart's de-escalation policy is a matter that can properly be resolved by voluntary agreement with its associates.

I am not proposing to resolve a disputed question of fact. On summary judgment, however, it is entirely appropriate for a court to ask whether there is a legal barrier to a plaintiff's claim that may deprive the plaintiff of a right to present the case to a jury. And the background facts are entirely "relevant to deciding whether self-defense is the kind of clear and substantial public policy that qualifies as an exception to the at-will rule." *Supra* ¶ 65. The majority, in fact, considers them too. It just does so behind the veil of the summary judgment assumption that the employee-plaintiffs in this case could not safely disengage. Ultimately, the court concludes that the matter addressed by Wal-Mart's de-escalation policy is not a proper subject of voluntary contract. And that decision, at least implicitly, is premised on the notion that employees are sufficiently likely to have a right of self-defense that outweighs the employer's interest in workplace safety. So both opinions are making assumptions. Neither of us are treating the underlying facts as "not relevant." *See supra* ¶ 65.

employee. That will be the inevitable effect of the employee's right to sue. Wrongful termination suits are costly, and the threat of such a suit accordingly gives the employee substantial leverage. That leverage will make it harder for Utah employers to get their employees to follow their workplace violence policies on a day-to-day basis.[144] And the Utah workplace will inevitably be less safe as a result. [145] I dissent from the court's conclusion that the public policy of the State of Utah requires this troubling result.

---

[144] *See Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 724 (W. Va. 2001) (Maynard, J., dissenting) ("[T]he new substantial public policy exception to the employment at will doctrine renders no-fighting policies unenforceable as well. Now every time an employee is discharged for fighting, he or she will sue his or her employer and claim self-defense. The majority opinion will have the unfortunate result of taking disciplinary decisions out of the hands of private employers and placing these decisions in the court."). I recognize that the court's *holding* does not formally "prohibit[] employers from requiring their employees to disengage from violent situations when they have the opportunity." *See supra* ¶ 65 n.114. But it will have that practical effect, as a result of the leverage inherent in the employee's right to sue.

[145] *See, e.g.*, Rebecca K. Yau et al., *Does Employee Resistance During a Robbery Increase the Risk of Customer Injury?* 57 J. OCCUPATIONAL & ENVTL. MED. 417, 417 (2015) (concluding that employee resistance increases the likelihood of injury by 160%); Corinne Peek-Asa et al., *Employee and Customer Injury During Violent Crime in Retail and Service Businesses*, 96 AM. J. PUB. HEALTH 1867, 1869 & tbl. 2 (2006) (concluding that "[r]esisting the perpetrator of the crime was consistently related to increased risk of injury for both employees and customers, and the risk was higher for robberies than for all other violent crimes combined"); Kathryn Brown Schaffer et al., *A Case-Site/Control-Site Study of Workplace Violent Injury*, 44 J. OCCUPATIONAL & ENVTL. MED. 1018, 1018 (2002) (noting studies that identified "employee resistance during a robbery" as "contribut[ing] to an increased risk of injury"); Kimberly A. Faulker et al., *Robbery Characteristics and Employee Injuries in Convenience Stores*, 40 AM. J. INDUST. MED. 703, 705, 706 & tbl.II (2001) (concluding from data set that "[i]njury rates were highest among employees who resisted"); *see also Feliciano*, 559 S.E.2d at 725–26 (Maynard, J., dissenting) ("It is clear to me that recognizing self-defense as a substantial public policy exception to the employment at will doctrine is not only

(Continued)

A.C.J. Lee, dissenting

¶86 Today's decision jeopardizes employee safety in Utah. And it opens the door to a free-wheeling, case-by-case public policy exception that threatens to swallow the rule of at-will employment.

¶87 I respectfully dissent on three grounds. First, I find no support for the right of self-defense *as formulated by the majority* in the constitutional, statutory, and common law sources it cites. Second, I cannot conclude that the manner of an individual's exercise of the right of self-defense is a matter of "overarching importance to the public as opposed to the parties only." *Touchard*, 2006 UT 71, ¶ 17 (internal quotation marks omitted). Finally, I do not believe that the public interest in the manner of an individual's exercise of the right of self-defense outweighs the interests of Wal-Mart in "regulat[ing] the workplace environment to promote . . . security." *Hansen v. America Online, Inc.*, 2004 UT 62, ¶ 11, 96 P.3d 950.

**I**

¶88 For many decades our common law has embraced the presumption that employment in Utah is "at will," meaning that it may be terminated by either party for any reason or for no reason.[146] This is no arbitrary presumption. It is the expression of a longstanding state policy—that our economy in general, and labor markets in particular, will be enhanced by a system of employment that is flexible and generally unencumbered by litigation.[147]

---

unnecessary but will do more harm than good. It is likely to increase the chance of physical altercations between employees and robbers, which, in turn, will result in injuries to employees and customers . . . .").

[146] *E.g.*, *Hansen v. Am. Online, Inc.*, 2004 UT 62, ¶ 7, 96 P.3d 950 ("Utah's employment law presumes that all employment relationships entered into for an indefinite period of time are at-will, where the employer or the employee may terminate the employment for any reason (or no reason) except where prohibited by law.").

[147] RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 342–43 (6th ed. 2003) (concluding that at-will employment is economically efficient and noting that "outside of the unionized sector . . . and government employment . . . , employment at will is the usual form of labor contract in the United States," and lamenting that "[d]espite its efficiency properties," courts are turning the at-will presumption "into a de facto requirement of showing good cause for firing a worker"); Richard A. Epstein, *In Defense of the Contract At Will*, 51 U. CHI. L. REV. 947, 950 (1984) ("The flexibility afforded by the contract

(Continued)

¶89 Any individual faced with an unforeseen job loss will inevitably bristle at the imposition of the at-will presumption. But our law has long embraced the principle that overall, and across the broad run of employment disputes, we will be better off with a system that eschews drawn-out disputes in favor of a policy of letting bygones be bygones.[148]

¶90 The presumption is rebuttable. But our law has placed strict limits on the means of rebuttal. Where the basis for rebuttal is in a violation of public policy, we have required that the policy be "clear and substantial," *Hansen v. America Online, Inc.*, 2004 UT 62, ¶ 7, 96 P.3d 950, or in other words "so clear and weighty that we should place the policy beyond the reach" of voluntary agreement. *Touchard v. La-Z-Boy Inc.*, 2006 UT 71 ¶13, 148 P.3d 945 (internal quotation marks omitted). The applicable public policy, moreover, must be in positive statements of law. *Id.* ¶ 12 ("A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions." (internal quotation marks omitted)). And it must affect a matter of "overarching importance to the public as opposed to the parties only," and clearly "outweigh" the employer's interest in regulating the workplace. *Id.* ¶¶ 10, 13 (internal quotation marks omitted). In my view the employee-plaintiffs' claims fail at every turn under this framework.

A

¶91 The majority concludes that Utah law upholds a "clear and substantial public policy favoring the right of self-defense." *Supra*

---

at will permits the ceaseless marginal adjustments that are necessary in any ongoing productive activity conducted, as all activities are, in conditions of technological and business change."); Mayer G. Freed & Daniel D. Polsby, *Just Cause for Termination Rules and Economic Efficiency*, 38 EMORY L.J. 1097, 1097–99, 1144 (1989) (noting that, "in the absence of unions, employment is almost always at will" even though parties are free to agree otherwise, and concluding that at-will employment is an efficient economic arrangement for labor markets and that "replacing the at-will rule with some form of governmental review of dismissal decisions will be costly").

[148] *See* Epstein, *supra* note 147, at 982 ("The strength of the contract at will [doctrine] should not be judged by the occasional cases in which it is said to produce unfortunate results, but rather by the vast run of cases where it provides a sensible private response to the many and varied problems in labor contracting.").

A.C.J. Lee, dissenting

¶ 38. Yet the right that it ultimately endorses is not the right enshrined in our law. It is a new one, tailored to the employment context. Specifically, in place of the "stand-your-ground" right protected by statute and longstanding caselaw, the court announces a more narrow right—a right to fight back only if you are "unable to withdraw from an imminent threat of death or serious bodily harm." *Supra* ¶ 57.

¶92  I dissent from the court's analysis because none of its cited authorities establish *this* right of self-defense. The court's common law authority, *supra* ¶ 34, is precisely in line with the governing statute. The cases recognize a broad stand-your-ground right of self-defense, *see State v. Turner*, 79 P.2d 46, 54 (Utah 1938), with a duty to retreat only as to *trespassers and initial aggressors. See People v. Hite*, 33 P. 254, 257 (Utah Terr. 1893).

¶93  The court's constitutional authority also falls short. Our constitution is undoubtedly "'fundamental'" in many senses. *See supra* ¶ 21 (quoting *Hansen v. Am. Online, Inc.*, 2004 UT 62, ¶ 12, 96 P.3d 950). But I cannot agree that the limitations of the constitution are our "'most fundamental'" expressions of the public policies we deem *sufficient to override an employer's interest in regulating the workplace*. The constitution does not speak to rights in the workplace. It preserves fundamental rights of citizenship from incursion by the government.

¶94  Courts in other jurisdictions have properly observed that provisions of federal and state constitutions are "a problematic source of public policy to support a claim of wrongful discharge, because most [such] provisions protect only against abuses of government power." 2 MARK A. ROTHSTEIN ET AL., EMPLOYMENT LAW § 9:9, at 628 (5th ed. 2014) (also noting that "attempts to assert against private sector employers federal and state constitutional provisions that require government action generally fail").

¶95  To date, this court has not embraced this principle. But I think we should. If public policy exceptions rooted in the exercise of a legal right are limited to rights connected to employment, *infra* ¶ 111, we cannot reflexively extend *constitutional limitations on governmental power* to private employers. We should be skeptical of this extension. Private employers, for example, may understandably wish to limit their employees' speech on matters undermining the interests of the employer. That strikes me as perfectly reasonable. And an employee who speaks out against an employer should have no public policy basis for a wrongful termination suit—regardless of the fact that the right of free speech is undoubtedly "fundamental" when it is infringed by the government. *See, e.g., Barr v. Kelso-Burnett*

*Co.*, 478 N.E.2d 1354, 1356–57 (Ill. 1985) (private employers not bound under public policy exception to follow Free Speech Clauses of federal and state constitution); *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 634 (Mich. Ct. App. 1992) (same).[149]

¶96 Even assuming that the constitutional provisions cited by the court are expressions of public policy *in the context of employment*, moreover, the majority still has failed to establish a constitutional basis for the public policy it announces. The cited provisions speak at too high a level of generality to establish a policy favoring the exercise of the right of self-defense in the precise manner identified by the court.

¶97 Article I, section I recognizes the "inherent and inalienable right" of Utahns "to enjoy and defend their lives and liberties." Without more, I have no idea what that right entails. The vague,[150] aspirational nature of the text—encompassing the "right" to "enjoy" our "lives"—suggests that this provision was simply the bare bones to which the legislature would later add flesh. And the history of this

---

[149] I do not mean to rule out the possibility of a constitutional public policy sufficient to sustain an exception to at-will employment. A constitutional right that is connected to the right of employment, or in a suit against a public employer, for example, might well suffice. But we should not broadly assume that the exercise of constitutional rights is a basis for a claim for wrongful termination against a private employer. Our cases may have reiterated that point repeatedly in dicta, *see supra* ¶ 24 n.31, but we have never found a constitutional policy as a matter of actual holding.

[150] The court says it sees "no ambiguity in the text" of this provision. *Supra* ¶ 24 n.32. But it offers no basis for its construction of the constitutional text, only an *ipse dixit* insistence that the constitution does not require "stand-your-ground" defense but only a limited right (encompassing a duty to retreat). *Supra* ¶ 31. That is not an indication of clarity of the constitutional text, but only of the court's insistence on finding meaning in it. The court, after all, makes only a general nod to its recognition of the "basic contours" of the historical right it recognizes. It never attempts to define those contours, much less to limit the policy announced today to the terms of the historical right. *See supra* ¶ 24 n.32.

provision confirms that conclusion. The debates in the convention suggest that this provision was not understood as self-executing.[151]

¶98 Article I, section 6 also falls short of sustaining the right embraced by the majority. This provision does not protect a freestanding right of self-defense. It establishes "[t]he individual right of the people to keep and bear arms." UTAH CONST. art. I, § 6. The reference to "defense of self" is a modifier—one in a series of *purposes* for which an individual has a right to bear arms. In context, the terms of this provision are not susceptible to a reading that guarantees a freestanding right to "defense of self." If we adopt such a reading, we are implicitly adopting a construction that guarantees a freestanding right to "security" and to "other lawful purposes," as those terms are precisely parallel with the reference to "defense of self." Each of those terms—"for security," for "defense of self," and "for other lawful purposes"—has a parallel position in the linguistic structure of article I, section 6. These are not independently protected rights. They are *purposes* for which the right to bear arms may attach. And because the right to bear arms is not at issue in this case (and in fact has previously been rejected as a basis for a public policy exception to the presumption of at-will employment, *see Hansen*, 2004 UT 62, ¶ 20), article I, section 6 yields no support for the plaintiffs' claims.

¶99 I can agree with the general proposition that the "Utah Constitution supports the notion that Utah law reflects *a state public policy* in favor of self-defense." *Supra* ¶ 24 (emphasis added). But that statement of state policy is far too general to be helpful. It begs all of the important questions about the nature and scope of the right of self-defense protected by our law, and against whom it is recognized.

¶100 The court ultimately answers those questions. Later in its opinion the majority asserts that our stand-your-ground statute, Utah Code section 76-2-402, "is not the constitutional minimum." *Supra* ¶ 31. It appears to conclude, moreover, that the constitutional right of self-defense is one that "embodies a duty to retreat in some

---

[151] *See* 1 PROCEEDINGS AND DEBATES OF THE CONVENTION ASSEMBLED TO ADOPT A CONSTITUTION FOR THE STATE OF UTAH 361–62 (1898) (identifying several delegates referring to "the inalienable right to enjoy and defend [one's] lif[e] and liberty" as only "a declaration of general principle," comparing it to another provision in the Constitution that was merely a "patriotic utterance" and that "the Legislature shall provide how [those rights] will be secured").

A.C.J. Lee, dissenting

circumstances," including in the context of employment.[152] *Supra* ¶ 32.

¶101 That may be a defensible line to draw in the employment context. But it is not the line drawn by our law as it currently stands. The duty to withdraw attaches by law only to a trespasser or an initial aggressor.[153] The employee-plaintiffs are neither. *See supra* ¶ 33 (acknowledging that "employees defending themselves in the workplace are [not] on the same footing as a trespasser or someone engaged in mutual combat"). So the right we establish today is not one recognized in the "authoritative sources" required by our cases—in existing statements of positive law.[154] *See Touchard*, 2006

---

[152] The basis for this conclusion is unclear, and to me quite troubling. I agree that the right of self-defense recognized in our caselaw and statutes *may not be* "coextensive" with the terms of the Utah Constitution. But the question of the meaning and scope of the operative provisions of our constitution was not addressed in the briefs filed in this case. And the court's opinion offers no textual or originalist analysis of the provisions it cites. It simply asserts that stand-your-ground is "not the constitutional minimum," and that some more limited right (encompassing a duty to retreat) *is*. *Supra* ¶ 31.

This is not the right case for us to resolve that important question. In a future case, in which the legislature restricts the right of self-defense and a defendant challenges such restriction on constitutional grounds, we may then be positioned to offer a conclusive construction of the Utah Constitution's protection of the right of self-defense. In doing so here, we resolve a significant constitutional question in a case in which it is not remotely presented and not adequately briefed. I respectfully dissent from that decision.

[153] UTAH CODE § 76-2-402(2)(a)(iii), (3) (providing that a person has a "duty to retreat" if he "was the aggressor," and then must "withdraw[] from the encounter and effectively communicate[] to the other person his intent to do so"); *State v. Standiford*, 769 P.2d 254, 264 (Utah 1988) (noting that the initial aggressor generally loses the right of self-defense); *State v. Starks*, 627 P.2d 88, 90 (Utah 1981) (same).

[154] The majority asserts that "Utah did not become a 'Stand Your Ground' state until 1994," citing a founding-era statute that it portrays as staking out a "narrower right of self-defense." *See supra* ¶ 31 & n.48 (citing REVISED STATUTES OF UTAH § 75-14-4168(3) (1898)). I see no meaningful difference between this statute and our existing

(Continued)

UT 71, ¶ 12 ("A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions." (internal quotation marks omitted)).

¶102 The lack of established legal support for the line drawn by the majority should be fatal to the employee-plaintiffs' claims. Our law has long emphasized the need to maintain careful limitations on the sources we look to for the public policies that may override the presumption of at-will employment. We have consistently held that such policies must be "plainly defined"[155] by authoritative sources of positive law. That restriction is a core element of our doctrine in this field,[156] for at least three reasons.

¶103 First, by limiting wrongful termination claims to cases implicating public policies plainly enshrined in existing law, we "avoid unreasonably eliminating employer discretion in discharging employees." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 405 (Utah 1998). This is important. For reasons noted above, the at-will presumption is aimed at preserving active, agile markets for labor. A

---

law, however. Both recognize the so-called right to "stand your ground" as it currently stands—the general right to use force when there is a reasonable apprehension of "great bodily injury," with the exception of a duty to withdraw where the person "was the assailant or engaged in mortal combat." REVISED STATUTES OF UTAH § 75-14-4168(3) (1898). Neither this statute nor our current one, Utah Code section 76-2-402, leaves any room for the policy endorsed by the court today—of a duty to withdraw by a non-trespasser who was not the initial aggressor.

[155] *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 405 (Utah 1998) ("A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions."); *Rackley v. Fairview Care Ctrs., Inc.*, 2001 UT 32, ¶ 16, 23 P.3d 1022 (noting that a public policy is "'clear' if it is plainly defined by one of three sources": statutes, constitutional provisions, or judicial decisions).

[156] I do not doubt that it is within our "province" to announce new public policies not enshrined in positive law. *Supra* ¶ 23. We undoubtedly have the power to move in a new direction in this field. The presumption of at-will employment is a common law matter. We can abandon it entirely if we choose to do so (subject to the right of the legislature to override us if it wishes). So we can also surely expand on the standards for embracing exceptions as well. Doing so strikes me as unwise, however, for reasons highlighted below.

broad, undisciplined use of the public policy exception will undermine that goal while also interfering with longstanding prerogatives of Utah employers.[157]

¶104 Second, a limited conception of the public policy exception also protects important reliance interests in the employment relationship and provides adequate notice of impending tort liability. An employer can, at least arguably, reasonably anticipate the imposition of tort liability for wrongful termination in cases implicating existing, entrenched legal policies. If we extend the public policy exception to *newly formulated policies*, however, we jeopardize the employer's reasonable expectations—in a manner yielding a troubling extension of tort law. *Cf. B.R. ex rel. Jeffs v. West*, 2012 UT 11 ¶¶ 25–28, 275 P.3d 228 (discussing the importance of foreseeability in both the duty and proximate cause aspects of a negligence claim). No employer can reasonably anticipate the courts' formulation of new public policies as a basis for tort liability. And the imposition of wrongful termination liability is troubling in this context.

¶105  This concern is highlighted by our decision clarifying that wrongful termination claims sound in tort (and include the possibility of punitive damages). *See Peterson v. Browning*, 832 P.2d 1280, 1284 (Utah 1992).[158] The potential for such exposure highlights

---

[157] *Hansen v. Am. Online, Inc.*, 2004 UT 62, ¶ 9, 96 P.3d 950 ("Owing to the stability and predictability afforded employers and employees by the at-will rule, we have been justifiably wary of brushing broad public policy landscapes on the canvas of these cases . . . ."); *see also supra* ¶ 85 n.145.

[158] At least one element of our decision in *Peterson* has subsequently been called into question. Our *Peterson* opinion suggested that the conclusion that "the public policy exception sounds in tort is consistent with our adoption of the tort of intentional interference with economic relations in *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982)," in that "[t]he discharge of an employee because of his failure to violate a clear and substantial public policy is an 'improper purpose' under this definition." *Peterson v. Browning*, 832 P.2d 1280, 1284–85 (Utah 1992). Yet the improper purpose basis for an intentional interference claim was recently "abandoned" in our caselaw. *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 64, 345 P.3d 553.

(Continued)

the need for careful, predictable exceptions to the at-will presumption. *See id.* at 1285 (Howe, A.C.J., concurring) (highlighting the need for the public policy exception "to be applied narrowly and only when there exists a violation of a clear and substantial public policy," and emphasizing that our limitations on the exception assure that it should not be a matter "of concern to employers who are guided by honesty in their employment relations"). Properly restricted, "[t]he public policy exception is narrow enough in its scope and application to be no threat to employers who operate *within the mandates of the law* and clearly established public policy *as set out in the duly adopted laws.*" *Id.* at 1285–86 (emphasis added) (quoting *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 878 (Mo. Ct. App. 1985)). A tort claim under this exception, moreover, is aimed at deterring activity "that contravenes clear and substantial public policies." *Id.* at 1285 (lead opinion of Durham, J.). But these premises will not hold for newly announced public policies divorced from positive statements of law.

¶106 Employers may reasonably anticipate the courts' announcement of public policies set forth in "duly adopted laws." And they may accordingly be properly deterred from terminating employees on the basis of such policies. But they cannot reasonably do so for newly adopted—and judicially adapted—state policies. In extending our law to encompass such a policy, the majority ignores an important limitation of our law in this field. In so doing, moreover, it opens up new vistas of exposure for Utah employers.[159]

---

The *Peterson* decision still stands, however. And unless and until it is overruled, it provides additional grounds for limiting the public policy basis for an exception to at-will employment in Utah.

[159] My point is not that the right to sue for termination in violation of public policy is limited to positive law "directly regulat[ing]" the employment relationship by "'restrict[ing] the right of an employer to terminate an employee.'" *Supra* ¶ 59. The majority is right that such a limitation would render the public policy exception "meaningless," *supra* ¶ 59, as there is no need for a common law right to sue for wrongful termination where a statutory right is already in place. Instead, my point is narrower: In our prior cases, we have limited the *substance* of the public policy we recognize as a basis for a claim for wrongful termination to the terms of the public policy recognized in our positive law. The court takes a significant step away from this important limitation in its decision today. In asserting a judicial prerogative of embracing "public policy exceptions . . . not . . . coextensive with the statutes or constitutional

(Continued)

provisions upon which they are based," *supra* ¶ 54, the majority erases (or at least substantially blurs) an important limitation of our doctrine in this field.

Our prior cases have not embraced this prerogative. In defining the substantive scope of our state public policy in this field, we have limited ourselves to the terms of existing state law. *See, e.g., Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1043 (Utah 1989) ("In recognizing and following principles of public policy, we must be careful to avoid overextension of the principles involved."); *Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 166 (Utah 1991) (emphasizing that the scope of public policy will be provided by "narrow and clear-cut definitions of a specific public policy"); *Ryan.*, 972 P.2d at 409 (concluding that an employer violated public policy only if he fired an employee for reporting under a statutory duty, and not for conduct outside of the "narrow duty" the statute imposed). We have not reformulated the terms of existing state policy in the way the court does here.

The cases cited by the majority, *supra* ¶¶ 55–57, are not to the contrary. *See Touchard v. La-Z-Boy Inc.*, 2006 UT 71, 148 P.3d 945; *Heslop v. Bank of Utah*, 839 P.2d 828 (Utah 1992); *Peterson*, 832 P.2d 1280;. These are not cases in which the substantive scope of the state public policy that we recognized "exceeded the statement of positive law upon which it was based." *Supra* ¶ 58. Admittedly the statutes in question did not "prohibit[] an employer from firing someone" for violating the statute. *Supra* ¶ 56. But the point is that the underlying substantive policy we recognized was precisely the one enshrined in statutes—in *Peterson*, a law upholding the right of an employee to "report[] 'a violation of a law, or rule promulgated under the law of this state, a political subdivision of this state, or any recognized entity of the United States'," 832 P.2d at 1281 n.2 (quoting Utah Code Ann. § 67-21-3(1)); in *Heslop*, a law penalizing the "failure or refusal to submit accurate and timely call reports" to state regulators, 839 P.2d at 837 (citing UTAH CODE § 7-1-318); and in *Touchard*, a workers compensation provision guaranteeing a right to benefits for injuries incurred on the job, 2006 UT 71, ¶ 12 (citing UTAH CODE ANN. §§ 34A–2–105(1)).

In none of these cases did we recast, limit, or extend the substantive policy of the underlying law (e.g., of the right to report a violation of law, or of the elements of the law criminalizing accurate call reports to state regulators, or of the right of an employee to workers compensation benefits). Today's opinion breaks new ground in this respect. In past cases, we have admittedly "'look[ed]

(Continued)

A.C.J. Lee, dissenting

¶107 Finally, and perhaps most importantly, a closed universe of state public policy is essential to the continuing viability of our longstanding doctrine of at-will employment. It is one thing to impose liability for termination in violation of existing public policy. Where we do so we can properly say we are not altering the presumption of at-will employment, but only recognizing a narrow exception to it. We do great violence to the presumption, however, and in fact we effectively repudiate it, where we recognize a right of wrongful termination in a case implicating a *new* public policy of our own formulation. In that instance, we are not recognizing an exception to the at-will presumption. We are developing a common law doctrine of wrongful termination, in which our courts will decide, on a case-by-case basis, whether the employer's interests are sufficient to override the employee's, and thus to justify termination of employment.

¶108 This is a troubling development in our law. And a much bigger one than the court's opinion acknowledges. I would follow the terms of our caselaw as it currently stands. And in so doing I would hold that the narrow right of self-defense recognized today is not a basis for a wrongful termination claim because it is nowhere enshrined in any authoritative statement of law.[160]

B

¶109 The majority also concludes that our Utah policy of self-defense is a matter "'of overarching importance to the public as opposed to the parties only.'" *Supra* ¶ 39 (quoting *Retherford v. AT&T*

---

beyond the provision in question to determine whether the motivating policy behind it constitutes a clear and substantial public policy.'" *Supra* ¶ 23 (quoting *Rackley v. Fairview Care Ctrs.*, 2001 UT 32, ¶ 23, 23 P.3d 1022). But we have not taken it upon ourselves to reformulate the policy of our positive law in this field.

[160] Our law, of course, does recognize a right of self-defense that is broader than the one the court endorses. Yet that right—of standing your ground, and never retreating even when it is reasonably feasible to do so—would clearly have to yield to the interests of the employer in maintaining the safety of the workplace. *See supra* ¶¶ 14, 18. So even assuming that a policy recognizing a defense to criminal liability is a matter that translates appropriately to the employment context, *but see supra* ¶ 85, our existing policy of self-defense cannot sustain a right of action for wrongful termination.

*Commc'ns*, 844 P.2d 949, 966 n.9 (Utah 1992)). Again I see the matter differently. In my view the right to self-defense is primarily a private matter—a defense from criminal liability, as a privilege to engage in aggressive activity that would otherwise be criminal.

¶110  The court's analysis on this point suffers, at the outset, from the problem noted above. Instead of looking for a matter of overarching public importance in the exercise of the right of self-defense under our law as currently stated, it reframes the analysis. It looks for such an interest in that right when exercised in the limited manner defined in the majority opinion. Even then, moreover, the court does not assert that the exercise of the right of self-defense is a matter necessarily benefitting the public. It simply notes that the right of self-defense includes the right to defend third parties, and thus that its exercise may "protect[] individuals from serious injuries and deter[] the completion of crimes." *Supra* ¶ 40.

¶111  That is insufficient. The mere possibility of protecting the public falls far short of the standard the law sets for overriding the employer's substantial interest in regulating the terms and conditions of employment. Where the basis for an exception is the exercise of a legal right or privilege, the right in question must redound *unquestionably* to the public good.[161] Generally such an exception should be limited to the exercise of those rights that relate to a worker's status as an employee.[162] *See* ROTHSTEIN, *supra* § 9:11

---

[161]  *Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 13, 148 P.3d 945 (when determining public policy exceptions, courts consider "whether the public interest is *so strong* and the policy *so clear and weighty* that we should place the policy beyond the reach of contract" (emphasis added)(internal quotation marks omitted)); *see also Wilburn v. Mid-South Health Dev., Inc.*, 343 F.3d 1274, 1278 (10th Cir. 2003) ("[T]he identified public policy must be truly public, rather than merely private or proprietary."(internal quotation marks omitted)); *Silo v. CHW Med. Found.*, 45 P.3d 1162, 1166–67 (Cal. 2002) ("The public policy that is the basis of this exception must furthermore be 'public' in that it affects society at large rather than the individual . . . ." (internal quotation marks omitted)).

[162] So far as I can tell, our precedents have adhered to this view of what "rights" can serve the basis of a public policy exception. *See Touchard*, 2006 UT 71, ¶ 48 (holding that employees have a wrongful discharge claim against their employers if they were terminated for exercising their workers' compensation rights); *Ryan*, 972 P.2d 395, 408 (Utah 1998) (noting that "exercising a legal right or privilege,

(Continued)

(explaining that "employees must enjoy the right because of their status as employees, and not because of some other status they may have, such as citizen or taxpayer"). With respect to those rights, the employer has no legitimate ground for intervening. And for that reason it can be said that the public interest is "so clear and weighty that we can place the policy beyond the reach of contract." *See Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 405 (Utah 1998); *Hansen*, 2004 UT 62, ¶ 10 (noting that the principal public policy grounds for rebutting the presumption of at-will employment are matters on which the employer has "no legitimate economic objective").[163]

---

such as filing a workers' compensation claim" can serve the basis of a public policy exception to at-will (citation omitted)). And we have never, to my knowledge, deemed a provision of our constitution to establish a public policy exception to the at-will doctrine. *See Hansen*, 2004 UT 62, ¶ 22 (declining to recognize the constitutional right to bear arms under the Utah Constitution as a clear and substantial public policy to serve the basis of a public policy exception to at-will employment); *Rackley*, 2001 UT 32, ¶ 20, 23 (declining to recognize public policy exceptions emanating from article I, sections 1 and 27 of the Utah Constitution). This fact significantly erodes the reliance on our constitution as serving the basis for exceptions to the at-will employment doctrine, dicta in *Hansen* and other cases, *supra* ¶ 24 n.31, notwithstanding.

[163] The majority rebuffs this analysis as incompatible with our caselaw as it stands. *See supra* ¶¶ 43–46. It says that under *Hansen* and other cases, there is no requirement that a public policy exception rooted in the exercise of a legal right or privilege "redound unquestionably to the public good." *Supra* ¶ 42 (internal quotation marks omitted). I read our cases differently. I understand the cautionary language in *Hansen* to reflect a need for a limitation on the circumstances in which the exercise of a legal right or privilege may be enough to sustain a right to sue for wrongful termination. And regardless of whether we imposed this limitation explicitly, it seems inherent in the general principle employment is presumptively at will, and that we depart from that presumption only in the limited case in which an employee's termination violates a public policy that is "so clear and weighty that we can place the policy beyond the reach of contract." *See  Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 405 (Utah 1998). That was certainly a square holding of *Ryan*. And it is deeply embedded in our precedent. We should reiterate it here. And doing so requires that we reject a policy

(Continued)

A.C.J. Lee, dissenting

¶112 The right of self-defense falls short under these standards. Such right is not related to the worker's status as an employee.[164] And the exercise of this right, as defined by our criminal law, is not a matter conceived as an unmitigated good, or on which the employer has no legitimate interest.[165] Instead, our law of self-defense is rooted in a policy recognizing the difficulty of split-second judgments on matters of life or death. Under that policy, we give the benefit of the doubt to the person who reasonably uses force to defend himself, with a privilege from criminal liability even in circumstances where less force (or even withdrawal) might ultimately have been preferable.[166] But the point of the policy is not that every split-second

---

like that asserted here—on which the employer has a legitimate basis for objecting to the right exercised by the employee.

[164] *See Hoven v. Walgreen Co.*, No. 1:11-cv-881, 2012 WL 6025790, at *5–*6 (W.D. Mich. Dec. 4, 2012) (dismissing claim for wrongful termination arising out of employee's attempt to thwart an armed robbery on the ground that the self-defense provisions cited by the plaintiff were "not directed at conferring rights on employees" (internal quotation marks omitted)).

[165] *See Scott v. Extracorporeal*, 545 A.2d 334, 341–43 (Pa. Super. Ct. 1988) (acknowledging that there are "'areas of an employee's life in which his employer has no legitimate interest,'" but holding that regulating the use of force in self-defense is not one of them, given that the matter "strikes entirely too near the employer's legitimate interest in discharging employees it perceive to be disruptive" (quoting *Geary v. U.S. Steel Corp.*, 319 A.2d 174, 180 (Pa. 1974)); *McLaughlin v. Barclays Am. Corp.*, 382 S.E.2d 836, 840 (N.C. 1989) (concluding that the "kind of deleterious consequences for the general public" implicated in other cases sustaining a claim for wrongful termination in violation of public policy are not involved in a case in which the employer fires an employee for breach of company policy of de-escalation of violence in the workplace).

[166]*E.g.*, *People v. Goetz*, 497 N.E.2d 41, 48 (N.Y. 1986) (observing that self-defense law has "never required that an actor's belief as to the intention of another person to inflict serious injury be correct in order for the use of deadly force to be justified," but only that "the belief comport with an objective notion of reasonableness"); *Shorter v. People*, 2 N.Y. 193, 197 (1849) ("When one who is without fault himself, is attacked by another in such a manner or under such circumstances as to furnish reasonable ground for apprehending a design to take away his life, or do him some great bodily harm, . . .

(Continued)

A.C.J. Lee, dissenting

use of defensive force is in the public interest; it is that criminal liability is too big a penalty to impose on a mere error in judgment in the heat of a violent confrontation.[167]

¶113 I agree, of course, that our law has long protected an individual who exercises such discretion from the imposition of criminal liability. But the mere existence of a legal privilege from criminal liability tells us little about our public interest *in the manner in which the right of self-defense is exercised*. I find nothing in the sources cited in the briefs or in the court's opinion suggesting that our law *favors* the exercise of self-defense over a decision to stand down or withdraw. In many cases, the split-second decision to fight back will appear improvident in hindsight.[168] The law of self-defense

---

he may safely act upon appearances, and kill the assailant, if that be necessary to avoid the apprehended danger; and the killing will be justifiable, although it may afterwards turn out that the appearances were false, and there was *in fact* neither design to do him serious injury, nor danger that it would be done."); 2 WHARTON'S CRIMINAL LAW § 127 (15th ed. 2015) ("A defendant may kill in self-defense when he reasonably believes that he is in imminent danger of losing his life or suffering great bodily harm. There need not be actual danger; it is sufficient merely that defendant believe there is danger, provided the belief is reasonable.").

[167] As Justice Holmes famously observed, "[r]ationally" failing to flea a violent confrontation that ended in death would be "a circumstance to be considered with all others in order to determine whether the defendant went farther than he was justified in doing." *Brown v. United States*, 256 U.S. 335, 343 (1921). But the law "has tended in the direction of rules consistent with human nature," and therefore for purposes of imposing criminal liability, "[d]etached reflection cannot be demanded in the presence of an uplifted knife." *Id.* "[I]t is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety or to disable his assailant rather than to kill him." *Id.*

[168] *See, e.g.*, *Shorter*, 2 N.Y. at 197–98 (quoting Chief Justice Parker of Massachusetts in the trial of Thomas O. Selfridge (1806); giving the hypothetical of an assailant with only powder in his pistol threatening the defendant, who then kills the assailant with a club only to discover there was no real threat; asserting that self-defense requires only a reasonable belief of a threat and not actual danger;

(Continued)

protects the decision regardless. But it does so not because we think that aggression is always better than retreat, but because the imposition of criminal liability is a harsh consequence.

¶114 We cannot decide whether the exercise of the right of self-defense will redound to the public good in the abstract. The devil will always be in the details. The majority effectively concludes that the right of self-defense *can* preserve and protect human life *when* it is exercised properly. Those are huge caveats. And they highlight the fact that the public interest analysis of the exercise of the right of self-defense will always require nuanced, case-by-case evaluation. Such evaluation is not a matter resolved by our law. It will require case-by-case refinement over time.

¶115 And that fact reveals a fatal flaw in the majority's approach: If the public interest in the exercise of the right of self-defense depends on case-by-case evaluation, and not wholesale application of our law, then it cannot be said that our policy redounds unquestionably to the public good, or that the matter falls beyond the reach of contract.[169]

¶116 An individual confronted by an assailant faces a dilemma—of whether to retreat or fight back. He may properly choose the former, even in the face of an imminent risk of injury. Doing so in no way undermines our public policy.[170]

---

concluding that any "different rule would lay too heavy a burden upon poor humanity").

[169] *See Scott*, 545 A.2d at 342–43 (concluding, given the summary judgment "posture of th[e] case," that the employee-plaintiff "acted in self-defense," but rejecting the public policy basis of a wrongful discharge claim nonetheless—explaining that "the employer held her at least partially accountable for the disturbance," and that second-guessing that judgment "'would have the unwise effect of transferring to the judicial forum the duty of evaluating the propriety of management decisions'" (quoting *Rossi v. Pa. State Univ.*, 489 A.2d 828, 836 (Pa. Super. Ct. 1985)).

[170] In my view the concession that "Wal-Mart's policy may be consistent with the clear and substantial public policy" recognized by the court, *supra* ¶ 52, should be dispositive. If Wal-Mart's policy is consistent with the right of self-defense the court recognizes, then an employee's agreement to follow that policy should be enforceable.

C

¶117 The majority's final conclusion is that the public policy protecting the right of self-defense "outweighs employers' interest in being able 'to manage their workforces and regulate their workplace environments to promote productivity, security, and similarly lawful business objectives.'" *Supra* ¶ 47 (quoting *Touchard*, 2006 UT 71, ¶ 17). Again the court's analysis is dependent on its framing of the question, however. Thus, in light of the summary judgment posture of the case (in which all reasonable inferences are given to the nonmoving parties), the majority assumes that the employee-plaintiffs "were 'unable to safely disengage' from a threat of violence." *Supra* ¶ 51. And it even indicates that they "face[d] the prospect of severe injury or death with no opportunity to withdraw." *Supra* ¶ 51. In these circumstances, the court concludes that the right of self-defense outweighs the employer's interest in controlling its workplace, asserting that "[t]he law should not require employees to choose between keeping their jobs and protecting themselves or others from a serious, imminent threat of harm." *Supra* ¶ 51.

¶118 As noted above, however, we have no reason to assume that these employees were really "unable to safely engage," much less that they faced "severe injury or death." Those premises are merely an artifact of the procedural posture of the case. And it may well turn out—and for reasons noted above, *supra* ¶¶ 8–9, I think it likely will—that the stronger inference is that the employee-plaintiffs in this case fought back unnecessarily. It also seems quite likely that *most* workers who are fired for defending themselves will fit that bill. It would be the rare employer indeed who would actually fire an employee for defending himself in the face of a threat of "severe injury or death with no opportunity to withdraw." *Supra* ¶ 51.

¶119 Because that prospect seems so unlikely, moreover, I rather doubt that many employees faced with a life-or-death threat will actually stand down due to concerns over losing their job. That will surely be the outlier case. The more common case, by far, will be the opposite—in which the employee faced with *less than* a life-or-death threat, or with reasonable path to withdraw, nonetheless intervenes in an attempt at vigilantism.

¶120 The majority concedes that the employer's interests outweigh the employee's in this latter circumstance. *See supra* ¶ 52. Yet it opens the door to claims for wrongful termination that substantially undermine the employer's ability to protect that interest. The threat of a tort claim for wrongful termination will yield substantial leverage for the employee who is fired for fighting back

in the face of workplace violence. If, as I suspect is the case, most such employees will fall more in the vigilante camp than the life-or-death without the possibility of retreat camp, the net effect of today's decision will be to increase vigilantism.

¶121 We should not formulate policy in this sensitive area on the basis of the outlier case. The majority assumes this case is the outlier in light of the procedural posture of summary judgment. But I doubt that assumption reflects reality. And the decision protecting the right to sue in this outlier circumstance seems sure to do more harm than good.[171]

¶122 I would reject the employee-plaintiffs' proffered basis for a public policy exception to the presumption of at-will employment. For reasons noted below, I find substantial support for my analysis in our own precedents and in those from other jurisdictions.

1

¶123 Our decision in *Hansen v. America Online*, 2004 UT 62, 96 P.3d 950, seems to me to strongly undermine the employee-plaintiffs' claims in this case. *Hansen* rejects a public policy basis for a wrongful termination claim under the Utah Constitution, and implementing provisions of the Utah Code, protecting the individual right to bear arms. *Id.* ¶¶ 15–22 (citing UTAH CONST. art. I, § 6; UTAH CODE § 63-98-102). The plaintiffs in *Hansen* cited these provisions as sustaining their legal right to bear arms in the workplace, and thus to sue for wrongful termination when their employer fired them for bringing their guns to work. We rejected that argument, emphasizing the high bar for establishing a public policy exception based on the exercise of a legal right or privilege.

¶124 First, we noted that the "exercise[] [of] a legal right or privilege" "poses analytical challenges different from, and generally

---

[171] The majority claims that such considerations are mere "speculation," and "not relevant to deciding whether self-defense" sustains a public policy exception to at-will employment. *Supra* ¶ 65. I disagree. The operative test expressly invites us to determine whether a purported right outweighs an employer's concrete and unquestioned interest in controlling the workplace. In order to do so, we must assess the likelihood that such terminations will occur, and balance this likelihood against the very real risk of increased litigation and the second-guessing of the employer's judgment. That is the essence of the public policy analysis called for in our cases. We cannot properly eschew it as irrelevant, or speculative.

greater than, the other[]" recognized grounds for a public policy exception to the presumption of at-will employment. *Id.* ¶ 10. With respect to the other grounds, for example, we emphasized that an employer's decision to terminate an employee generally "serves no legitimate economic objective and corrodes civil society." *Id.* That point is clear, for example, with respect to a termination of employment based on an employee's refusal to "commit an illegal or wrongful act," or decision to perform a "public obligation," or to report to a "public authority criminal activity of the employer." *See id.* ¶ 9 (internal quotation marks omitted) (citing *Ryan*, 972 P.2d at 408) (listing these other grounds for public policy exception). Yet that does not necessarily hold for a termination based on an employee's exercise of a legal right. An employer may have an entirely legitimate interest in that circumstance. *See id.* ¶ 11 (noting that in this context "both the employer and the employee may appeal to public policy in aid of their cause"). And the employer's interests may well outweigh the employee's. *See id.* (indicating that "[t]he analysis of whether the public policy exception applies to a particular legal right or privilege will frequently require a balancing of competing legitimate interests: the interests of the employer to regulate the workplace environment to promote productivity, security, and similar lawful business objectives, and the interests of the employees to maximize access to their statutory and constitutional rights within the workplace").

¶125 In *Hansen* we found the employer's interests to prevail. And we based that decision on our determination that the governing constitutional and statutory provisions did not conclusively establish that an employer's "fundamental" interest in controlling its "private property" "must give way" to the "right to possess firearms" in safeguarding "private and public security." *Id.* ¶ 21 (noting that the employee-plaintiffs had cited "evidence that private and public security is better safeguarded by an armed citizenry"). Citing the legislative debate on the operative statute, we found a lack of "clarity" in the alleged legislative intent to elevate the right to possess firearms over "the rights of an employer." *Id.* ¶ 24. And finding at most "ambivalence" on the part of the legislature on this matter, we rejected the employees' claim, concluding that they had failed to carry their burden of showing that the right to bear arms clearly outweighed the employer's right to preserve the safety of its private property. *Id.*

¶126 The above analysis applies with equal force to this case. Nothing in the Utah stand-your-ground statute suggests that the legislature intended to elevate the right of self-defense above the rights of an employer to preserve the safety of its workplace. The

A.C.J. Lee, dissenting

criminal law of self-defense, in fact, has long been understood to harbor "ambivalence" on the prudence of any particular act of defensive aggression, so long as there was an objectively reasonable basis for it.[172] That is evident in the fact that not all forms of aggression that are justified under the criminal law seem appropriate in hindsight.[173] Again, a person subjected to attack may reasonably choose to stand down or seek to retreat even when that course seems difficult. Nothing in our law indicates any "clarity" on the part of our legislature in extending the terms of a privilege from criminal liability to a legal right of employment. I see no basis for concluding that our legislature intended to elevate the right of self-defense as defined in our criminal law over the important right of an employer to protect the security of its workplace in the manner it sees fit.

¶127 Indeed, the lack of criminal liability when an employee meets force with force *in the workplace* tells us nothing of relevance to

---

[172] *See, e.g.*, *Brown*, 256 U.S. at 343 (noting that self-defense as a shield from criminal liability has never required "that one in [a seemingly life-threatening] situation should pause to consider whether a reasonable man might not think it possible to fly with safety or to disable his assailant rather than to kill him").

[173] *See, e.g.* Annie Wells, Note, *Home on the Gun Range: Discussing Whether Kansas's New Stand Your Ground Statute Will Protect Gun Owners Who Use Disproportionate Force in Self-Defense*, 56 U. KAN. L. REV. 983, 983–84 (2008) (noting the acquittal of a defendant under the Stand Your Ground statute where the defendant got into a verbal altercation with two men, flashed a gun, and then when the other men returned with a third man in a car, shot five times through the windshield then walked over to the car and shot nine more times into the driver's side window, killing two of the three mean inside); Zachary L. Weaver, Note, *Florida's "Stand Your Ground" Law: The Actual Effects and the Need for Clarification*, 63 U. MIAMI L. REV. 395, 413–14 (2008) (noting an incident where a masked man was in his mother's backyard carrying a small souvenir baseball bat in order to protect his mother's property from another neighbor she suspected had stolen things from her; that neighbor became alerted to someone "lurking in the bushes behind the backyard," and pulled a knife on him; then the neighbor's father saw the stand-off and shot the masked man even though he was still on his mother's property; the prosecutor did not charge based on Stand Your Ground, but commented: "Nobody involved in this decision feels good about it.") (internal quotation marks omitted).

the question as framed in *Hansen*—of whether the legislature has spoken with "clarity" on an intent to elevate an individual's exercise of the right of self-defense over "the rights of an employer" to control the workplace. *Id.* ¶ 24. In my view it has not. The legislature has said nothing on the question whether a policy preserving for the employer the final say on the reasonableness of any particular act of self-defense is an agreement void against public policy.

2

¶128 Unlike the majority, I view the authority cited by Wal-Mart as thoroughly persuasive. *See supra* ¶¶ 66–72 (citing cases from three state supreme courts and two federal courts). The cited cases undermine the majority's approach and reinforce a number of the elements of my analysis.

¶129 In *Scott v. Extracorporeal, Inc.*, for example, the Pennsylvania Supreme Court contrasts a dispute over the proper exercise of the right of self-defense with "areas of an employee's life in which his employer has no legitimate interest." 545 A.2d 334, 341 (Pa. Super. Ct. 1988) (internal quotation marks omitted). The *Scott* court assumes, moreover, that the employee-plaintiff in that case "acted in self-defense," noting that this assumption is dictated by the summary judgment posture of the case. *Id.* at 342. But it nonetheless declines to "deny the employer the right to dismiss due to its subjective evaluation that the employee behaved disruptively." *Id.* And it ultimately upholds the employer's prerogative to resolve disputes on such questions, moreover, highlighting concerns with "transferring to the judicial forum the duty of evaluating the propriety of management decisions." *Id.* at 343 (internal quotation marks omitted).

¶130 The North Carolina Court of Appeals' analysis in *McLaughlin v. Barclays Am. Corp.*, 382 S.E.2d 836 (N.C. Ct. App. 1989), rests on similar conclusions. In that case the court "accept[s]" the employee-plaintiff's "contention that his striking his subordinate resulted solely from his efforts to protect himself from battery," given the need to view the evidence in the light most favorable to the nonmoving party. *Id.* at 838. But the *McLaughlin* court nonetheless proceeds to reject the claim to a public policy exception. In so doing, it concedes that the evidence, in the light most favorable to the employee-plaintiff, "shows that his superiors displayed virtual indifference to his repeated requests for help in dealing with a problem employee," and that their investigation of the incident in question was "shallow and perfunctory." *Id.* at 840. But *McLaughlin* nonetheless concludes that there was no basis for a wrongful termination claim under a public policy exception, emphasizing that

A.C.J. Lee, dissenting

there was no basis for finding "bad faith" by the employer, and highlighting the problem with a contrary holding: "Were we to recognize a cause of action in this case," the court warns, "every employee involved in an altercation would assert a self-defense justification, spawning [a] deluge" of litigation undermining the employer's prerogative of controlling the workplace. *Id.*; *see also Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 312–13 (Md. Ct. Spec. App. 1995) (quoting the foregoing portion of *McLaughlin* approvingly).

¶131 The majority seeks to distinguish these cases on the ground that they involved plaintiffs who "articulated a right of self-defense that encompassed instances where employees used force in retaliation or in circumstances where there was an opportunity to withdraw." *Supra* ¶ 67. That is an accurate characterization of the employer's position in the above cases. But it overlooks the employee's view, which is accepted by the court for purposes of summary judgment. And, as noted, the courts in *Scott*, *McLaughlin*, and *Bagwell* all accept the employee's assertion of reasonable self-defense for purposes of their analysis. But they nonetheless reject the assertion of a public policy right to sue for wrongful termination on the basis of a need to respect employer discretion in this sensitive area.[174]

---

[174] As the majority indicates, *Bagwell* states that "*all* the evidence" presented in that case "point[ed] to the conclusion" that the employee was fired because the employer believed she "acted in retaliation." *Supra* ¶ 67 (quoting *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 313 (Md. Ct. Spec. App. 1995)). But that consideration was not dispositive in *Bagwell*. The court also emphasized the summary judgment posture of the case. *Id.* at 311 (giving the employee the benefit of the doubt on a disputed issue, based on the summary judgment "posture of the case"). And it quoted *McLaughlin* at length for the proposition that an employer's decision might be based on "'perfunctory'" analysis but still not be shown to be in "'bad faith.'" *Id.* In so doing, the *Bagwell* court emphasized the need for deference to the employer's subjective judgment, while warning of the troubling effect of a "deluge" of suits allowing courts to second-guess the employer's decision. *Id.* (internal quotation marks omitted).

The fact that the evidence was one-sided in *Bagwell* is accordingly beside the point of its principal analysis. And in any event, the court's observation does not at all apply here. Here the record is

(Continued)

A.C.J. Lee, dissenting

¶132 I would resolve this case on that basis. I would uphold the enforceability of Wal-Mart's arrangement with its employees—an arrangement, from all that appears, that is in line with that adopted by retailers far and wide. And I would reject the employee-plaintiffs' assertion of a public policy basis for a wrongful termination claim regardless of the premise on summary judgment that they acted reasonably in self-defense and lacked a reasonable means of withdrawal.[175]

## II

¶133 I agree with the majority that our public policy in Utah encompasses the goal of "preserv[ing] and protect[ing] human life." *Supra* ¶ 40. But I see no reason to believe that an agreement like that which Wal-Mart has with its associates—of requiring them to retreat instead of fighting back, reserving a right of self-defense if necessary, and leaving the resolution of doubts on whether the policy was followed to the employer—will undermine that policy. If anything, Wal-Mart's arrangement will preserve and protect human life in the long run. Presumably that's why such policies are endorsed in occupational safety standards and adopted by so many retailers.

¶134 The court's contrary conclusion seems to me to run a substantial risk of thwarting the very policy it is touting. In upholding the employee-plaintiffs' right to sue, the court is undermining the ability of retailers like Wal-Mart to enforce their policies of nonresistance in the workplace. The inevitable result will be more violence, not less.

¶135 In the long run, the majority's decision also threatens substantial violence to the at-will presumption under Utah law. If the public policy exception does not depend on the identification of

---

much more ambiguous, and much more open to two different conclusions.

[175] That conclusion need not foreclose the possibility of all such claims by all employees in this area. As the North Carolina Court of Appeals indicated in *McLaughlin*, the rejection of a public policy basis for a wrongful termination claim in a circumstance in which the employer's decision was not made in bad faith need not "close doors to plaintiffs who are able to show bad faith by the employer." *McLaughlin*, 382 S.E.2d at 840. No such showing can plausibly be made in this case, however, as the facts are such that Wal-Mart, at a minimum, can be said to have made a good faith determination that its employees fought back when they should have retreated instead.

an existing policy in authoritative sources of law, we will no longer have an at-will presumption. We will have a common law of wrongful termination.

¶136 Even in the field of self-defense, I doubt this case will be our final say on the availability of an employee's right to sue for wrongful termination. More difficult cases undoubtedly loom on the horizon.

¶137 Consider, for example, a case of third-party defense, in which an employee intervenes to protect a co-worker who is under a threat of violence by an armed robber 100 feet away. The employee's decision to intervene—to run across the room to confront the robber—would be justified under our law of self-defense.[176] But does our Utah public policy clearly encourage such acts of vigilantism—or clearly bar an employer from terminating an employee who engages in such activity? *See supra* ¶ 40 (basing the conclusion that the right of self-defense is of public importance on the fact that our law encompasses "the doctrine of defense of others"). The majority seems to suggest so. It asserts that the exercise of the right of defense of a third party "protects individuals from serious injuries and deters the completion of crime." *Supra* ¶ 40. But I see nothing in our law to support that conclusion. And workplace de-escalation policies (and the social science studies behind them) suggest that the opposite approach is likely preferable in the broad run of cases. *See supra* ¶ 76 n.138.

¶138 Alternatively, consider the circumstance of a bank teller who receives a note from an armed robber that says "Hand over the money in your till, and no one gets hurt," but responds by trying to disarm the gunman. Again the teller would be fully justified under our criminal law—even if the attempt at intervention causes the gunman to open fire on the teller and on other innocent bystanders. But is this exercise of self-defense so clearly in the public interest that an employer violates public policy for firing the employee for this act of vigilantism? The majority's analysis suggests that that would be the case. The teller, after all, is in no better position to retreat than the Wal-Mart associates at issue in this case. Yet again it seems to me

---

[176] *See* UTAH CODE § 76-2-402(1)(a), (b) (noting that a "person is justified in threating or using force [or deadly force] . . . to the extent that the person reasonably believes that force [or deadly force] is necessary to defend the person *or a third person* against another person's imminent use of unlawful force," used of deadly force, or "commission of a forcible felony" (emphasis added)); *supra* ¶ 40.

that the bank employer would be acting entirely reasonably in holding its employees to the requirement of turning over the money instead of fighting back in this instance. And the reasonableness of such a decision should sustain the bank's right to terminate the teller's employment without facing the potential liability of a wrongful termination claim.

¶139 Perhaps the majority would respond to these scenarios by adding new limitations on the policy of self-defense that it adopts today. As these or other cases arise, perhaps the court will say that our state policy of self-defense is restricted not only by a duty to retreat when reasonable, but also by a bank teller's duty to accede to a demand for money instead of fighting back, or by an employee's duty to stand down instead of intervening to help a co-worker. Those would be wise limitations if our goal is preserving safety in the workplace. But they are nowhere found on the face of the court's opinion, and they would further underscore the violence that today's decision does to our longstanding presumption of at-will employment.

¶140 We should limit public policy grounds for wrongful termination suits to cases involving the exercise of rights of employment enshrined in our law as written. I dissent from the majority's creation of a right of wrongful termination based on a policy of its own formulation, as that decision threatens workplace safety and undermines our longstanding presumption of at-will employment.

————————